Ernest F. **WALTERS**, Petitioner,

v.

Herb **MASCHNER**, Respondent.

No. C97–1025–MWB.

United States District Court,
N.D. Iowa,
Eastern Division.

July 11, 2001.

Stephen A. Swift, Klinger, Robinson & Ford, L.L.P., Cedar Rapids, Iowa, for Petitioner.

Ernest F. Walters, pro se.

Robert P. Ewald, Assistant Iowa Attorney General, Des Moines, Iowa, for Respondent.

MEMORANDUM OPINION AND OR-
DER REGARDING REPORT AND
RECOMMENDATION OF MAGIS-
TRATE JUDGE ON PETITION
FOR WRIT OF *HABEAS CORPUS*

BENNETT, Chief Judge.

TABLE OF CONTENTS

I. *INTRODUCTION* ...................................................1071
 A. *Factual Background*..........................................1071
 B. *Procedural Background* .......................................1072

II. *LEGAL ANALYSIS* .................................................1073
 A. *Standard Of Review* ..........................................1073
 B. *"Abandoned" Claims* .........................................1074
 C. *Alleged Errors By The Trial Court* ..............................1075
 1. *Denial of request for expert to aid in jury selection* ..............1076
 2. *Admission of evidence of "uncharged crimes"* .....................1076
 a. *The claim, the recommended disposition, and the objections*....1076
 b. *Reviewability of state rulings on admissibility of evidence* .......1078
 c. *Due process review in this case* ..............................1081
 D. *Alleged Errors By Trial And Appellate Counsel* .......................1084
 1. *Trial counsel's failure to strike a juror for bias* .....................1084
 a. *The claim, the recommended disposition, and the objections*....1084

 *b. Prongs of the "ineffective assistance" analysis* .................. 1086
 *i. Professional performance* ............................... 1087
 *ii. Prejudice* .......................................... 1088
 *2. Ineffective assistance concerning insufficiencies in the trial
 information* ........................................... 1094
 *a. Characterization of the claims* ................................ 1094
 *b. Recommended findings and disposition* ......................... 1097
 *c. Counsel's objections and requisite review* ...................... 1100
 *i. Lack of notice* ......................................... 1101
 *ii. Evidence of intent to kidnap Cheryl Beck* .................. 1105

*III. CONCLUSION* .................................................... 1107

Seeking relief from his convictions in state court for murder, burglary, robbery, and kidnapping, the petitioner filed a petition for a writ of *habeas corpus* from this federal court pursuant to 28 U.S.C. § 2254. The petitioner asserts, *inter alia,* that the state trial court violated his right to due process by denying his request for an expert to aid in jury selection and by admitting evidence of uncharged crimes; his trial counsel was ineffective in failing to strike a biased juror and in failing to argue that the trial information gave insufficient notice of the murder and burglary offenses with which petitioner was charged; and his appellate counsel was ineffective in failing to preserve trial counsel's error with regard to the insufficiency of the trial information. A magistrate judge recommends that relief be denied on all of the grounds asserted by the petitioner, and the petitioner asserts various objections to that recommendation, both *pro se* and through counsel. Therefore, this court must undertake a *de novo* review of the findings of fact and conclusions of law of the magistrate judge to which objections have been made.

## I. INTRODUCTION

### A. Factual Background

As Magistrate Judge Paul A. Zoss observed in his February 7, 2001, Report and Recommendation in this matter, the Iowa Supreme Court found the following facts on petitioner Ernest F. Walters's direct appeal of his October 18, 1985, convictions for first-degree murder, first-degree burglary, first-degree robbery, and two counts of second-degree kidnapping:

> Defendant Ernest Walters and Cheryl Beck lived with each other for several years. A son, Elijah, was born to them. In April 1985 Cheryl left Walters and moved back in with her parents, taking Elijah with her.
>
> In June 1985 Walters abducted Ruth Corcoran. After forcing Corcoran to drive to St. Louis and then to Chicago, Walters and Corcoran drove to the home of Cheryl Beck's parents, in Jackson County[, Iowa]. Carrying a handgun, Walters forced his way into the Beck house. Walters shot and killed Cheryl's father, Robert Beck, and shot and wounded Cheryl's mother and sister. Walters then fled, taking Corcoran, Cheryl and Elijah with him. At one point Walters sexually abused Cheryl. After two days Walters was apprehended in Missouri.

*State v. Walters,* 426 N.W.2d 136, 137–38 (Iowa 1988); *see also* Report and Recommendation at 2–3 (quoting this portion of the Iowa Supreme Court's ruling). As Judge Zoss correctly observed, these facts are "presumed to be correct" for purposes of Walters's *habeas corpus* action. *See* 28 U.S.C. § 2254(e)(1). Moreover, none of Walters's claims for *habeas corpus* relief in the present action involves a challenge to any of these facts.

### B. Procedural Background

Walters was tried before a jury in Iowa District Court for Muscatine County [1] after the trial judge granted Walters's motion for a change of venue for his trial from Jackson County, owing to pre-trial publicity and the prominence of the alleged murder victim, Robert Beck, in Jackson County. *See id.* at 138.[2] The jury convicted Walters on all five of the charges against him. Following his conviction, Walters was sentenced to life in prison on the murder charge and twenty-five years imprisonment on each of the other charges. The Iowa Supreme Court affirmed Walters's conviction on direct appeal on June 15, 1988, and dismissed as frivolous his appeal of denial of post-conviction relief, without an opinion, on March 15, 1993.

Walters then filed the present petition for *habeas corpus* relief pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Iowa. His petition was transferred to this court on June 9, 1997. On October 24, 1997, after initial review, the court ordered the respondent to answer the petition.[3] The court also granted Walters's application for appointment of counsel. The respondent answered the petition on February 13, 1998. Walters filed a "Recasted Petition" on October 16, 1998, which the respondent answered on November 10, 1998. The parties then submitted briefs in support of and resistance to the claims asserted in the "Recasted Petition." In Walters's case, the briefs included submissions by counsel and by Walters *pro se.*

On May 25, 2000, the undersigned referred this matter to Magistrate Judge Paul A. Zoss pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the petition. Judge Zoss heard oral arguments on the merits of Walters's petition on July 18, 2000, and submitted the Report and Recommendation currently under review on February 7, 2001, after receiving supplemental post-argument briefs from the petitioner, again through counsel and *pro se.*

Although Walters asserted eight grounds for relief in his "Recasted Petition," Judge Zoss concluded in his Report and Recommendation that Walters had abandoned grounds 4, 5, and 8. In his

---

1. In his *pro se* Objection No. 3, Walters objects to Judge Zoss's finding that the trial was held in Jackson County, Iowa, on the ground that Judge Zoss misstated the record, because the trial took place in Muscatine County beginning on September 17, 1985. Walters cites the transcript of pretrial motions and jury selection in support of his contention that trial took place in Muscatine County. The court concludes that Judge Zoss did misstate the location of Walters's trial. Therefore, Walters's Objection No. 3 is sustained, and Judge Zoss's Report and Recommendation is modified to reflect that Walters was tried in the Iowa District Court for Muscatine County, as stated in the body of this decision. However, Judge Zoss's misstatement of the location of Walters's trial is in no way material to Judge Zoss's recommendations concerning the disposition of any of Walters's grounds for *habeas corpus* relief, and Walters does not contend that it is.

2. On direct appeal of his convictions, Walters argued that the trial court should have moved his trial even further away from Jackson County or Cedar Rapids, Iowa, which is in Linn County, where Walters resided before his arrest. Walters argued that bias of the jurors had to be presumed, based on their exposure to media coverage emanating from Cedar Rapids, but the Iowa Supreme Court rejected this argument. *See Walters,* 426 N.W.2d at 138–39. Walters does not reassert this challenge to fairness of the venue here, although he does resurrect, in slightly different garb, some of his contentions concerning presumed bias of jurors.

3. The respondent was identified as Herb Maschner, who was then Warden of the Iowa State Penitentiary (ISP) in Fort Madison, Iowa. Maschner has since been succeeded as warden at the ISP by Leonard Graves.

Report and Recommendation, Judge Zoss characterized the claims Walters is still pursuing as follows:

1. Walters received ineffective assistance of counsel in violation of his Fifth, Sixth, and Fourteenth Amendment rights because his trial counsel "failed to strike or [re]move for cause juror Edna Phillips whose relationship to the State's complaining witnesses cause this juror to be biased or otherwise tainted."

2. Walters was denied his right to due process under the Fourteenth Amendment because the trial court denied Walters's motion for an expert to aid in jury selection.

3. Walters was denied his right to a fair trial under the Fourteenth Amendment because the trial court denied Walters's motion in limine to exclude testimony of "uncharged crimes," to-wit: that Walters had sexually abused his wife [girlfriend Cheryl Beck].

\* \* \* \* \* \*

6. Walters's trial counsel was ineffective in failing to argue the felony underlying Count II of the indictment (first degree burglary) "was not defined or identified until the jury instructions were given."

7(a). Trial counsel was ineffective for failing to argue "lack of sufficient notice" in Count I of the indictment, the killing of Bob Beck.

7(b). Appellate counsel was ineffective for failing to preserve a claim that trial counsel was ineffective for failing to argue "lack of sufficient notice" in Counts I and II of the indictment.

Report and Recommendation at 4–5. Walters has not objected to Judge Zoss's characterization of the claims he is still pursuing. However, Walters does object to other portions of Judge Zoss's February 7, 2001, Report and Recommendation, which recommends denial of all of Walters's claims.

Specifically, on February 20, 2001, Walters's counsel filed objections to the portions of the Report and Recommendation pertaining to the grounds for relief identified above as 6, 7(a), and 7(b). *See* Plaintiff's Objections To Report And Recommendation, February 20, 2001 (Petitioner's Counsel's Objections). On March 26, 2001, after an extension of time to do so, Walters filed *pro se* objections to the portions of the Report and Recommendation pertaining to grounds for relief identified above as 1 and 3. *See* Plaintiff's Objections To Magistrate's Report And Recommendation, March 26, 2001 (Petitioner's *Pro Se* Objections). The objections by Walters and his counsel reflect the same "division of labor" shown in their briefing on the merits of Walters's claims for relief. However, neither Walters nor his counsel objected to the portion of the Report and Recommendation recommending denial of relief on ground 2 identified above.

On February 26, 2001, the respondent filed a response to Petitioner's Counsel's Objections, which simply referred the court to the respondent's arguments made in the respondent's brief filed on August 16, 1999. The respondent did not file a further response to Petitioner's *Pro Se* Objections.

Thus, Judge Zoss's February 7, 2001, Report and Recommendation and Walters's objections to it are now ripe for consideration by this court.

## II. LEGAL ANALYSIS

### A. Standard Of Review

■ The standard of review to be applied by the district court to a report and recommendation of a magistrate judge is established by statute:

A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate [judge].

28 U.S.C. § 636(b)(1). The Eighth Circuit Court of Appeals has repeatedly held that it is reversible error for the district court to fail to conduct a *de novo* review of a magistrate judge's report where such review is required. *See, e.g., Hosna v. Groose,* 80 F.3d 298, 306 (8th Cir.) (citing 28 U.S.C. § 636(b)(1)), *cert. denied,* 519 U.S. 860, 117 S.Ct. 164, 136 L.Ed.2d 107 (1996); *Grinder v. Gammon,* 73 F.3d 793, 795 (8th Cir.1996) (citing *Belk v. Purkett,* 15 F.3d 803, 815 (8th Cir.1994)); *Hudson v. Gammon,* 46 F.3d 785, 786 (8th Cir. 1995) (also citing *Belk*). However, the plain language of the statute governing review provides only for *de novo* review of "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). Therefore, portions of the proposed findings or recommendations to which no objections are filed are reviewed only for "plain error." *See Griffini v. Mitchell,* 31 F.3d 690, 692 (8th Cir.1994) (reviewing factual findings for "plain error" where no objections to the magistrate judge's report were filed).

The court will review Judge Zoss's recommended disposition of each of the grounds for relief asserted in Walters's "Recasted Petition" according to the applicable standard of review, in light of the objections filed by Walters and his counsel.

### B. "Abandoned" Claims

As mentioned above, Judge Zoss concluded in his Report and Recommendation that Walters had abandoned grounds 4, 5, and 8 asserted in his "Recasted Petition." These three grounds for relief are that

Count V, the count charging the kidnapping of Ruth Corcoran, should have been severed from the other charges against Walters (Ground 4); that Walters's trial counsel was ineffective for asserting "self-defense" when counsel knew Walters would testify that the killing of Robert Beck at issue in Count I was "accidental" (Ground 5); and that trial counsel was ineffective, because he had a conflict of interest (Ground 8).

Walters's *pro se* Objection No. 4, which addresses these grounds for relief, consists of the following:

Walters objects to the terse finding by the Magistrate regarding the abandonment of issues enumerated 4, 5 and 8 in the amended petition for habeas corpus. (Report & Recommendation at 4–5). At the July 18, 2000 oral arguments, Walters informed the Magistrate that he was forced to abandon the issues because of change in the prison's legal access program, i.e., that the prison law library no longer updated Shepherd's Citations, and this prevented Walters from doing current research. Walters assumes, for purposes of this court's duties, that the decision by a habeas petitioner to abandon issues has no bearing on how that decision comes about.

Petitioner's *Pro Se* Objections at 29.

This objection is ambiguous. One reading is that Walters objects to Judge Zoss's failure to identify the reasons for Walters's abandonment of some of his claims, but Walters does *not* object to Judge Zoss's conclusion that the claims are abandoned or to Judge Zoss's failure to consider those claims. Another reading is that Walters contends that Judge Zoss should have considered whether his abandonment of these claims was involuntary, as a result of changes in the prison library's collection. This reading might require this court, on

*de novo* review, to consider whether changes in the prison library's collection were sufficient to render Walters's abandonment of his claims involuntary, and if so, to consider the merits of the purportedly abandoned claims.

Much of the ambiguity of Objection No. 4 arises from the incoherence of its last sentence. Logic suggests that Walters *meant* to say that he assumes, for purposes of this court's duties, that how his decision to abandon issues came about has no bearing on his decision to abandon the issues—that is, that the reasons for abandonment have no effect on whether the issues are actually abandoned. This reading would constitute a reaffirmation that Walters acquiesced in the court's conclusion that he had abandoned the claims, even if he was wrong in his assumption about the impact of reasons for abandonment on whether or not the claims were abandoned. However, this construction is exactly the opposite of what Walters *actually* said, which is the confusing statement that Walters assumes, for purposes of this court's duties, that the decision by a habeas petitioner to abandon issues has no bearing on how that decision comes about—that is, that the decision to abandon issues has no effect on the reasons for abandonment—which seems to put cause and effect in a rather peculiar relationship.

█ Even assuming that the proper reading of Objection No. 4 is that Walters objects to Judge Zoss's finding that Walters abandoned grounds 4, 5, and 8, *de novo* review of the record demonstrates that Walters has indeed abandoned those grounds for relief. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *see also Hosna*, 80 F.3d at 306 (it is reversible error for the district court to fail to conduct a *de*

*novo* review of a magistrate judge's report where such review is required); *Grinder*, 73 F.3d at 795 (same); *Hudson*, 46 F.3d at 786 (same). Nowhere in any of the briefing submitted before or after oral arguments before Judge Zoss or in support of objections to Judge Zoss's Report and Recommendation has Walters identified any portion of the record supporting his contentions in grounds 4, 5, and 8. Assertion of a factual basis for a particular ground for *habeas corpus* relief might require a court to consider that ground, even in the absence of citation of any legal authority in support of the claim. *See, e.g., Frey v. Schuetzle*, 78 F.3d 359, 361 (8th Cir.1996) (" 'A pro se ... petitioner is not required to identify specific legal theories ... in order to be entitled to relief.' ") (quoting *Jones v. Jerrison*, 20 F.3d 849, 853 (8th Cir.1994)). However, Walters's utter failure to identify any factual basis in the record for relief on grounds 4, 5, and 8, either in briefing before Judge Zoss submitted his recommended disposition or in Walters's objections to the Report and Recommendation, *does* constitute an abandonment of these grounds for *habeas corpus* relief.

Therefore, the court accepts Judge Zoss's conclusion that Walters has abandoned grounds 4, 5, and 8 in his "Recasted Petition."

### C. Alleged Errors By The Trial Court

Of the claims still at issue in Walters's "Recasted Petition," grounds for relief 2 and 3 allege that the trial court committed certain errors, while grounds 1, 6, 7(a), and 7(b) allege errors by trial or appellate counsel. The court will begin its review of these issues with Walters's allegations of errors by the trial court. Walters briefed these issues *pro se.* Judge Zoss recommended that relief be denied on both of the claims of error by the trial court.

### 1. Denial of request for expert to aid in jury selection

■ As "Ground Two" for relief in his "Recasted Petition," Walters asserts that he "was denied his right to due process where the trial court denied his motion for an expert to aid in jury selection al[l] in violation of the Fourteenth Amendment." "Recasted Petition," ¶ 12.B. Ground Two. However, no party has filed objections to Judge Zoss's recommendation that relief be denied on "Ground Two." In these circumstances, de novo review of Judge Zoss's recommendation concerning this ground has not been triggered. See 28 U.S.C. § 636(b)(1) (de novo review is required for "those portions of the report or specified proposed findings or recommendations to which objection is made"). Therefore, the court concludes that de novo review of this claim for relief is not required, and the court will instead review only for "plain error." See Griffini, 31 F.3d at 692.

The court finds that there was no "plain error" in Judge Zoss's recommendation that relief be denied on "Ground Two." Upon consideration of the record and arguments of the parties, Judge Zoss concluded that relief should be denied on this ground, because Walters had identified no " 'clearly established law, as determined by the Supreme Court of the United States' " supporting his contention that the trial court erred in failing to grant his motion for appointment of an expert to aid in jury selection, and Judge Zoss had found none. Report and Recommendation at 21 & n. 9 (quoting 28 U.S.C. § 2254(d)(1)). Judge Zoss found further that courts were nearly uniform in holding that no such right exists. Id. at 21. Finally, Judge Zoss concluded that "Walters has made no legal or factual showing that a jury selection consultant was a 'basic tool' required for the defense of the charges against him." Id. at 22. Therefore, Judge Zoss concluded

that Walters could not prevail on this issue. Id.

The court agrees with Judge Zoss's findings and conclusions as to this ground for relief and notes further that Walters filed no objection concerning the disposition of this ground for relief, and thus has not now identified any decision of the United States Supreme Court that would "clearly establish" his right to a jury selection expert, as required for relief under 28 U.S.C. § 2254(d)(1). Finding no plain error, the court will accept Judge Zoss's recommendation that relief be denied on "Ground Two."

### 2. Admission of evidence of "uncharged crimes"

The disposition of Walters's second allegation of error by the trial court—admission of evidence of "uncharged crimes"—requires de novo review, because Walters has filed objections to the portion of Judge Zoss's Report and Recommendation recommending denial of relief on this ground. See 28 U.S.C. § 636(b)(1). To conduct such a review, the court begins with a statement of the claim as pleaded, Judge Zoss's recommended disposition, and Walters's pro se objections.

#### a. The claim, the recommended disposition, and the objections

As "Ground Three" for habeas corpus relief, Walters asserts that he "was denied his right to a fair trial under the Fourteenth Amendment when the trial court denied his motion in limine to suppress testimony of uncharged crimes." "Recasted Petition," ¶ 12.C. (Ground Three). As supporting facts, Walters alleges the following:

The trial court erroneously denied a motion in limine that sought to prevent the government from introducing testimony that Petitioner had sexually

abused his wife (an uncharged crime). The testimony substantially prejudiced Petitioner and did nothing to complete the government's theory of Second–Degree Kidnap. The testimony of sexual abuse from Petitioner's wife prejudiced the jury, inflamed their passions of contempt and prejudice, causing petitioner not to receive a fair trial. Petitioner was not charged with sexual abuse, and nothing of a[n] actual nature was needed by the government to cause sex abuse to be brought out at trial in order to prove their Second–Degree Kidnap theory. The government's sole purpose in using the tainted testimony was to prejudice the jury and gain an unfair advantage over Petitioner.

*Id.*

Upon consideration of the record and the arguments of the parties on this issue, Judge Zoss found that Walters's trial counsel had moved to exclude Cheryl Beck's testimony about alleged forcible intercourse based on lack of relevance and materiality, but the trial court denied that motion, and the testimony came in during trial without further objection. Report and Recommendation at 23. Judge Zoss also found that, at trial, Walters admitted having sex with Cheryl Beck, but contended that it was consensual. *Id.* Judge Zoss found that, on direct appeal, the Iowa Supreme Court had ruled that the evidence of sexual abuse was admissible under state law " 'to show the complete story of the crime,' " even if it incidentally showed the commission of another crime. *Id.* (quoting *Walters*, 426 N.W.2d at 140). Although Judge Zoss found that Walters did not reassert the issue in his post-conviction relief proceedings, Walters had presented it in these proceedings as a denial of due process, that is, as a federal constitutional claim, with extensive argument concerning the admissibility of the evidence under Rule 404(b) of the Federal Rules of Evidence. *Id.* Judge Zoss expressed his

doubt that the alleged error in admission of the evidence, on the grounds or relevance and materiality, had been preserved, because no objection had been reasserted at trial, but that, even if the error was preserved, the admissibility of evidence is a matter of state law, which this court is " 'powerless to determine.' " *Id.* (quoting *Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir.1997), *cert. denied*, 523 U.S. 1010, 118 S.Ct. 1197, 140 L.Ed.2d 326 (1998)). Furthermore, Judge Zoss concluded that Walters had not "fairly presented" his due process challenge to the admission of this evidence to the state court. *Id.* at 24. Therefore, Judge Zoss concluded that the due process claim was procedurally defaulted. "In any event," Judge Zoss concluded, "the argument is without merit, [because] [t]he evidence was properly admitted by the trial court to show the complete story of the crime." *See id.* Judge Zoss therefore recommended that relief be denied on this issue.

Walters aims two of his *pro se* objections, Objections Nos. 2 and 6, at this portion of Judge Zoss's Report and Recommendation. In Objection No. 2, Walters objects to Judge Zoss's finding that he did not "fairly present" his due process claim concerning admission of "bad act" evidence to the Iowa Supreme Court, because that finding is contradicted by the record. Walters contends that he presented the issue on direct appeal in a supplemental *pro se* brief, relying on federal cases, but the Iowa Supreme Court ignored his due process argument and simply resolved the question of admissibility of the evidence in terms of state law. Walters contends further that the federal decisions on which he now relies stand for the proposition that state evidentiary rulings rise to constitutional dimensions when they are of such magnitude that they result in the denial of fundamental fairness. As to fundamental fairness, Walters contends that admission of the evidence of

sexual abuse was irrelevant to any element the State needed to prove on any charged offense and that its admission was unfairly prejudicial, because it would have aroused the passions of the jury against him, so that the jury would not have been able to separate their anger at Walters from their determination of the facts constituting the offense of second-degree kidnapping. He also contends that his due process claim, as asserted here, was "fairly presented" and "exhausted," because he did everything he could to put the same issue before the Iowa Supreme Court.

Walters's *pro se* Objection No. 6 appears to be largely duplicative of Objection No. 2, because it again asserts Walters's objection to Judge Zoss's finding that there was no record evidence supporting the fact that Walters fairly presented his "due process/fair trial" claim to the state courts. Indeed, Objection No. 6 expressly cross-references Objection No. 2, adding only that the respondent conceded that Walters had exhausted this claim in his answer to the "Recasted Petition," and that Judge Zoss failed to note that Walters's trial counsel preserved the error in his motion for a new trial.

### b. *Reviewability of state rulings on admissibility of evidence*

■ Assuming, without deciding, that Walters's due process claim was properly preserved and "fairly presented" to the state court, the court concludes that the merits of the claim hinge upon this court's power to review state court determinations of the admissibility of evidence and whether, if reviewable, the admission of the "bad act" evidence in Walters's trial was improper. As to the first question, Judge Zoss concluded that this court is " 'powerless to determine that evidence is inadmissible as a matter of [state] law,' " Report and Recommendation at 23 (quoting *Sweet v. Delo,* 125 F.3d 1144, 1154 (8th Cir. 1997)), but he did not consider whether this court could review the admission of evidence on due process or other federal constitutional grounds. Instead, Judge Zoss concluded that the due process claim had been procedurally defaulted. *Id.* at 24. Nor does Judge Zoss's conclusion that, "[i]n any event, the argument is without merit" amount to a determination on the merits of Walters's *due process* argument—the second question the court now proposes to address, if the issue is reviewable—because Judge Zoss cited only Iowa state court decisions for the proposition that the evidence was properly admitted "[i]n any event" to "show the complete story of the crime," and none of those decisions considered the admissibility of evidence under a due process standard. *See id.*[4]

---

4. Judge Zoss cited *State v. Morris,* 2000 WL 381641, *4 (Iowa Ct.App. April 12, 2000); *State v. Montgomery,* 243 N.W.2d 596, 601 (Iowa 1976); and *State v. Drake,* 219 N.W.2d 492, 494 (Iowa 1974). The *Morris* decision applies the "completion of the story" standard of admissibility under state law, citing the decision of the Iowa Supreme Court on Walters's direct appeal, *Walters,* 426 N.W.2d at 140–41, but makes no reference to a due process standard. *See* 2000 WL 381641 at *4. The correct citation for *State v. Fryer* is 243 N.W.2d 1 (1976), and that decision again relies on the "completion of the story" standard without reference to a due process standard.

*See Fryer,* 243 N.W.2d at 6. In *Drake,* the Iowa Supreme Court held that "the circumstances surrounding the commission of a crime may ordinarily be shown, even if such evidence would otherwise be inadmissible," again without referring to a due process standard for admissibility of evidence, although the decision did hold that IOWA CODE § 698.1, which made it an offense for a male over the age of 25 years to carnally know and abuse a female under the age of 17 years, did not violate the due process or equal protection clauses of the Fourteenth Amendment. *See Drake,* 219 N.W.2d at 494 & 496.

Although Walters relies on out-of-circuit precedent for a federal court's authority, on *habeas corpus* review, to consider whether admission of evidence by a state court violated the petitioner's constitutional rights, he need not have gone so far afield. Rather, on several occasions, the Eighth Circuit Court of Appeals has recognized that a federal court may review state court evidentiary rulings *to determine whether the defendant's due process or other constitutional rights were violated,* which is precisely the kind of review Walters seeks here. Judge Zoss did not consider those decisions, so the court will review the most pertinent of them now.

As the Eighth Circuit Court of Appeals explained in *Harris v. Bowersox,* 184 F.3d 744 (8th Cir.1999), *cert. denied,* 528 U.S. 1097, 120 S.Ct. 840, 145 L.Ed.2d 706 (2000),

"Because questions concerning the admission of evidence are matters of State law, our review of such questions in a habeas corpus proceeding is limited to determining whether the defendant's constitutional rights have been violated." *Rainer v. Department of Corrections,* 914 F.2d 1067, 1072 (8th Cir.1990), *cert. denied,* 498 U.S. 1099, 111 S.Ct. 993, 112 L.Ed.2d 1077 (1991). *See also Parker v. Bowersox,* 94 F.3d 458, 460 (8th Cir. 1996), *cert. denied,* 520 U.S. 1171, 117 S.Ct. 1439, 137 L.Ed.2d 545 (1997).... A habeas petitioner

must show more than error requiring reversal on direct appeal to obtain relief. He must show that the alleged error rendered the entire trial fundamentally unfair—that there is a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different.

*Carter v. Armontrout,* 929 F.2d 1294, 1296 (8th Cir.1991) (internal quotations omitted). *See also Mercer v. Armontrout,* 844 F.2d 582, 587 (8th Cir.) (noting that habeas relief is available only if the alleged error "fatally infected the trial" and deprived the petitioner of "the fundamental fairness which is the essence of due process") (internal quotations omitted), *cert. denied,* 488 U.S. 900, 109 S.Ct. 249, 102 L.Ed.2d 238 (1988). In making our fundamental fairness determination, we "review the totality of the facts in the case and the fairness of the whole trial." *McDaniel [v. Lockhart],* 961 F.2d [1358,] 1360 [ (8th Cir.1992) ].

*Harris,* 184 F.3d at 752; *see also Robinson v. LaFleur,* 225 F.3d 950, 954 (8th Cir.2000) (concluding the petitioner's due process rights were not violated by exclusion of evidence in his trial in state court, citing *Bounds, infra,* for the proposition that a state court's evidentiary rulings warrant federal *habeas* relief under the due process clause only when the error was so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the petitioner of due process); *Barrett v. Acevedo,* 169 F.3d 1155, 1163 (8th Cir.1999) ("Of course, admissibility of evidence at a state trial is a matter of state law and ordinarily will not form the basis for federal habeas corpus relief. Only when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy.") (citations omitted), *cert. denied,* 528 U.S. 846, 120 S.Ct. 120, 145 L.Ed.2d 102 (1999); *Bounds v. Delo,* 151 F.3d 1116, 1119 (8th Cir.1998) (because evidentiary rulings involve questions of state law, federal courts are not free to reexamine them, but may review only to determine "whether the evidentiary rulings constituted a constitutional violation," and " '[a] state court's evidentiary rulings can form the basis for federal ha-

beas relief under the due process clause only when they were so conspicuously prejudicial or of such magnitude as to fatally infect the trial and deprive the defendant of due process' ") (quoting *Parker v. Bowersox,* 94 F.3d 458, 460 (8th Cir.1996), *cert. denied,* 520 U.S. 1171, 117 S.Ct. 1439, 137 L.Ed.2d 545 (1997)).

The due process or "fundamental fairness" review of the evidentiary question in *Harris* is still more on point, because the petitioner, like Walters, contended that his due process rights had been violated by the admission of evidence of uncharged "bad acts" in his trial for first-degree murder. *Harris,* 184 F.3d at 752. The court observed, "[T]here is no due process violation simply because a trial court admits evidence of a defendant's uncharged bad acts." *Id.* (citing *McDaniel,* 961 F.2d at 1360). The court also recognized that, like Iowa, Missouri's rule against admission of uncharged crimes, wrongs, or acts to show criminal propensity was subject to exceptions, including an exception " 'for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged' in order 'to present a complete and coherent picture of the events that transpired.' " *Id.* (quoting *State v. Harris,* 870 S.W.2d 798, 810 (Mo.) (*en banc* ), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994), the petitioner's direct appeal). The court concluded further that the state trial court had not committed a due process violation by admitting evidence of two "bad acts": a plan to conduct a drive-by shooting, and a plan to kill another person at a bar. *Id.* at 753–55.

As to the first "bad act" in question in *Harris,* evidence of the petitioner's plan to conduct a drive-by shooting, it was the state's theory that the petitioner's anger with the murder victim over not producing the petitioner's guns quickly enough to suit the petitioner, which prompted the petitioner to kill the victim, stemmed from the petitioner's desire to conduct a drive-by shooting of another person. *Id.* at 753. The court concluded as follows:

It seems clear to us that the evidence of Harris's plans to conduct a ride-by shooting not only completes the picture, as the state court concluded, it also provides a motive for shooting Willoughby. We have discussed similar matters in the context of the Federal Rules of Evidence. *See, e.g., United States v. Phelps,* 168 F.3d 1048, 1057–58 (8th Cir. 1999) (finding no abuse of discretion in admitting evidence relating to a defendant's actions before and after a shooting); *United States v. Luna,* 94 F.3d 1156, 1162 (8th Cir.1996) (holding that other bad acts evidence was admissible to explain the government's theory of the case, as well as for showing the defendant's motive for participating in an armed robbery); *United States v. White,* 645 F.2d 599, 602 (8th Cir.) (noting that evidence of other bad acts is admissible when it completes the story of the crime on trial), *cert. denied,* 452 U.S. 943, 101 S.Ct. 3092, 69 L.Ed.2d 959 (1981). In other words, this evidence had substantial probative value beyond any propensity effect. While our review is limited to constitutional issues, the prosecutor's comments and Michael Taylor's testimony regarding Harris's plans to conduct a ride-by shooting were proper matters for the jury's consideration. Therefore, we do not believe that the trial court transgressed Harris's due process rights by allowing the jury to hear this evidence. Indeed, the evidence was admissible.

*Harris,* 184 F.3d at 753.

As to evidence of a second "bad act," an incident at a bar relating to the petitioner's plan to kill yet another person, the court concluded that the evidence supported the state's theory of the case, and that, even if

the evidence was improper "propensity" evidence, "the admission of this arguably improper propensity evidence [did not] necessarily mea[n] that a constitutional error occurred." *Id.* at 754. The court noted that it had rejected, at least in part, the argument that the general rule against propensity evidence had "constitutional qualities," but even if the admission of the propensity evidence in that case was an error, "it did not fatally infect either the guilt phase or the penalty phase of Harris's trial." *Id.* at 755. This was so, because, as to the guilt phase, there was "overwhelming evidence of Harris's guilt," such that the court "believe[d] ... that Harris would have been convicted even had the allegedly prejudicial evidence regarding the Champagne Lounge been excluded." *Id.* Moreover, in the penalty phase of the trial, the jury found that other evidence was sufficient to establish the "depravity of mind" aggravating factor, and the jury had also found four other, independent aggravating circumstances, unrelated to any of the challenged "bad acts" evidence, so that "the evidence relating to Harris's plans to kill someone at the Champagne Lounge in no way fatally infected or tainted the penalty phase." *Id.*

The court concluded as follows:

> In summary, having reviewed the totality of the facts, we cannot say that admitting into evidence Harris's plans to conduct a drive-by shooting or his activities [at the Champagne Lounge] fatally infected the fairness of his trial, thereby depriving Harris of due process of law. *McDaniel,* 961 F.2d at 1360. Harris bears the burden of showing that some prejudice "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Harris has not met that burden. We deny Harris's request for

habeas relief based on the admission of this evidence.

*Harris,* 184 F.3d at 755–56 (emphasis in the original).

Thus, Walters is correct that this court can review a state court's admission of the "bad acts" evidence, but only to the extent of determining whether admission of that evidence amounted to a due process or other constitutional violation—and ordinarily only if the claim of improper admission on constitutional grounds was preserved, "fairly presented," and thus not procedurally defaulted. Again, the court will assume, without deciding, that the issue was preserved, "fairly presented," and thus not procedurally defaulted. The question therefore becomes whether review will reveal a due process violation in this case.

#### c. *Due process review in this case*

■ The court concludes that Walters cannot establish that admission of the "bad acts" evidence of his sexual abuse of Cheryl Beck "fatally infected the trial" to such an extent that it deprived him of "fundamental fairness." *Id.* at 752. First, "there is no due process violation simply because a trial court admits evidence of a defendant's uncharged bad acts." *Id.* Moreover, in reviewing the " 'totality of the facts in the case and the fairness of the whole trial,' " *id.* (quoting *McDaniel,* 961 F.2d at 1360), Walters has not carried his "burden of showing that some prejudice 'worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " *Id.* at 755 (quoting *Frady,* 456 U.S. at 170, 102 S.Ct. 1584) (emphasis in the original).

As the Eighth Circuit Court of Appeals held in *Harris,* in this case, the evidence of the sexual abuse of Cheryl Beck not only completes the picture, as the state court concluded, but. "had substantial probative value beyond any propensity effect." *Id.*

at 753. Walters contends that the admission of the "bad acts" evidence was not relevant to the state's proof of any element of the kidnapping charge involving the kidnapping of Cheryl Beck. However, Cheryl Beck's lack of consent to removal or confinement by Walters was an element of the offense. *See* IOWA CODE § 710.1 (defining "kidnapping" as requiring, *inter alia*, proof that the kidnapper removed or confined another person "knowing that [he] has neither the authority nor the consent of the other to do so") & § 710.3 (defining second-degree kidnapping as "[k]idnapping where the purpose is to hold the victim for ransom or where the kidnapper is armed with a dangerous weapon"); *see also State v. Goff*, 342 N.W.2d 830, 832 (Iowa 1983) (decision ante-dating Walters's offense and conviction defining the elements of second-degree kidnapping as including proof that the kidnapper confined the victim "knowing that he did not have authority or [the victim's] consent to do so"); *State v. Ledezma*, 549 N.W.2d 307, 310–11 (Iowa Ct. App.1996) (discussing, in the context of first-degree kidnapping, the element requiring proof that the kidnapper confined the victim "[k]nowing that he lacked her consent to do so"); *State v. Hayes*, 532 N.W.2d 472, 475 (Iowa Ct.App.1995) (second-degree kidnapping requires proof that the kidnapper "confined or forcibly removed the victim from place to place ... without the victim's consent"). Whether or not Cheryl Beck consented to accompany Walters was a contested issue at trial. Cheryl Beck testified that she was forced to accompany Walters, because he had taken Elijah, but Walters contended that Cheryl Beck accompanied him willingly. Plainly, evidence that Cheryl Beck subsequently consented to sex with Walters would have provided an inference that her "abduction" was actually consensual—and Walters tried to give rise to that inference by testifying that Cheryl Beck consented to sexual intercourse with him—and just as plainly, evidence that Cheryl Beck was subsequently forced to have sex with Walters would give rise to an inference that her abduction was also against her will. Therefore, even limited to a "constitutional" review, it is apparent in this case, as in *Harris*, that whether or not the sexual abuse occurred was a "proper matte[r] for the jury's consideration." *Harris*, 184 F.3d at 753. "Therefore, [the court] do[es] not believe that the trial court transgressed [Walters's] due process rights by allowing the jury to hear this evidence. Indeed, the evidence was admissible." *Id.*

Furthermore, even assuming, for the sake of argument, that the evidence was merely improper "propensity" evidence, the court "cannot say that the admission of this arguably improper propensity evidence necessarily means that a constitutional error occurred." *Id.* at 754. This is so, again as in *Harris*, because the court has "carefully reviewed the record and believe[s] there was overwhelming evidence of [Walter's] guilt" on the kidnapping charge involving Cheryl Beck and on all of the other charges against him, such that no fundamental unfairness infected the trial from admission of the "bad acts" evidence. *Id.* at 755.

Although the "bad act" evidence created a reasonable inference that Cheryl Beck was abducted against her will, even had this allegedly prejudicial evidence been excluded, the jury could reasonably have found, from the totality of other testimony concerning the circumstances under which Cheryl Beck left her home in Walters's company—including the facts that Walters was carrying Cheryl Beck's son, he had threatened her with a gun before grabbing her son, and he had shot her father, sister, and mother, indicating his willingness to use force—that Cheryl Beck was abducted without her consent. *Id.* The evidence independent of any "bad acts" evidence

was more than sufficient on all of the elements of the kidnapping offense involving Cheryl Beck and on all of the other offenses with which Walters was charged. *Id.* (considering the sufficiency of "independent" evidence in the absence of the challenged "bad acts" evidence). "Having considered the totality of the facts, [this court] cannot say that admitting this evidence undermined the fundamental fairness of [Walters's] trial." *Id.* Admission of the "bad act" evidence in this case did not deprive Walters of due process of law.

The court also concludes that Harris's reliance on Rules 404(b) and 403 of the Federal Rules of Evidence as establishing a due process error is misplaced. This is so, first, because the federal rules of evidence do not necessarily have "constitutional qualities." *See Harris,* 184 F.3d at 755. Moreover, Rule 404(b) is not applicable to evidence of uncharged offenses that are intertwined with the offenses charged. As the Eighth Circuit Court of Appeals recently explained,

> It is well established that where evidence of another crime is so intertwined with the offense of conviction that proof of one incidentally involves the other or explains the circumstances of the other, it is not extrinsic. *United States v. Phelps,* 168 F.3d 1048, 1057–58 (8th Cir. 1999); *United States v. Swinton,* 75 F.3d 374, 378 (8th Cir.1996). Such bad acts are not governed by Rule 404(b). *Phelps,* 168 F.3d at 1057–58.

*United States v. Molina,* 172 F.3d 1048, 1055 (8th Cir.1999), *cert. denied sub nom. Corona v. United States,* 528 U.S. 893, 120 S.Ct. 221, 145 L.Ed.2d 186 (1999). This interpretation of Rule 404(b) appears to this court to be an embodiment of the same "completes the story" exception for "propensity" evidence recognized under Iowa law. *See Walters,* 426 N.W.2d at 140–41. In *Molina,* the court concluded that the first controlled buy of drugs, on which no charges were based, was "sufficiently intertwined with the offenses charged to remove it from the purview of Rule 404(b)." *Molina,* 172 F.3d at 1055. In Walters's case, Rule 404(b) is inapplicable, because the sexual abuse of Cheryl Beck was also "evidence of another crime so intertwined with the offense of conviction that proof of one incidentally involves the other or explains the circumstances of the other," and so was "not extrinsic." *Id.* The evidence of the sexual abuse of Cheryl Beck "explain[ed] the circumstances" of the kidnapping and was also probative, as explained above, of the victim's lack of consent. Thus, it was not Rule 404(b) evidence and is not subject to a Rule 404(b) analysis. *Id.*

Walters's contentions concerning inadmissibility under Rule 403 fare no better. In *Molina,* the court also rejected the defendant's contention that, even if the evidence of one controlled buy was not subject to Rule 404(b), it should have been excluded under Rule 403, because its prejudicial effect outweighed its probative value. *Id.* at 1055–56. The court concluded that the evidence was highly probative of the defendant's guilt of the offenses charged, and admission of the evidence was not unfairly prejudicial, where the jury heard evidence of other controlled buys that involved greater quantities of drugs and money. *Id.* at 1056. Similarly, here, the court finds that the evidence of sexual abuse of Cheryl Beck was highly probative of whether she consented to her abduction, and thus was probative of an element of the charge involving her kidnapping. As to prejudice, "Rule 403 is concerned only with 'unfair prejudice, that is, an undue tendency to suggest decision on an improper basis.'" *United States v. Gabe,* 237 F.3d 954, 959–60 (8th Cir.2001) (quoting *United States v. Yellow,* 18 F.3d 1438, 1442 (8th Cir.1994)). As the decision in *Molina,* suggests, such "unfair preju-

dice" is absent where the jury has heard other evidence sufficient to support the conviction, which is the case here, so that the prejudicial effect of the evidence was not greater than its probative value. *Molina*, 172 F.3d at 1056. Thus, the admission of the evidence of sexual abuse was not barred by Rule 403. *Id.*

Therefore, assuming that Walters's due process challenge to the admission of evidence of sexual abuse was properly preserved, "fairly presented," and "exhausted" in state court, that challenge is without merit. Judge Zoss's Report and Recommendation is modified to include this conclusion, and his recommendation that relief be denied on this ground is accepted as modified.

### D. Alleged Errors By Trial And Appellate Counsel

Walters's remaining objections concern Judge Zoss's recommendation that relief be denied on his grounds 1, 6, 7(a), and 7(b), which involve claims of ineffective assistance from his trial and appellate counsel. Walters briefed the merits of ground 1 *pro se*, and also filed *pro se* objections to Judge Zoss's recommendation that relief be denied on that ground. However, Walters's counsel briefed the merits of grounds 6, 7(a), and 7(b), and filed the objections pertinent to those grounds.

#### 1. Trial counsel's failure to strike a juror for bias

##### a. The claim, the recommended disposition, and the objections

In his "Recasted Petition," Walters asserts as "Ground One" that he "received ineffective assistance of counsel in violation of his Sixth Amendment Rights." "Recasted Petition," ¶ 12.A. Ground One. As "supporting facts," Walters alleges the following:

Defendant's trial counsel failed to strike or move for cause juror Edna Phillips

whose relationship to the State's complaining witnesses caused this juror to be biased or otherwise tainted. Defendant suffered prejudice in that he was denied his right to a fair trial in violation of his Fifth, Sixth and Fourteenth Amendment Rights. Petitioner presented this issue in his State Court Post Conviction Relief action and in his Appeal of the denial of Post Conviction Relief.

*Id.* Walters devoted his most extensive *pro se* briefing to the merits of this issue as well as his most extensive *pro se* objections to Judge Zoss's Report and Recommendation.

As Judge Zoss noted, juror Edna Phillips had relatives who were close friends with the family of Robert Beck, the homicide victim, and that Walters contended that Phillips was consequently biased by inflammatory pretrial publicity and by her conversations with relatives, which began within hours after Beck's death. Report and Recommendation at 14–15. Judge Zoss made an extensive examination of the record of the voir dire of Ms. Phillips and the testimony of Walters's trial counsel in Walters's post-conviction relief proceedings, *see id.* at 15–17, and the court will not repeat here all of those portions of the record. Based upon his examination of the record, Judge Zoss concluded that Walters had not made the necessary showing that his trial counsel's assistance did not fall within the wide range of reasonable professional assistance nor did he overcome the presumption that his trial counsel's decision not to strike Phillips as a juror was a reasonable trial strategy. *Id.* at 18. Specifically, Judge Zoss concluded that the record established that Phillips had some prior knowledge of the facts underlying the charges against Walters, that she had some distant family connection to the victims, and that she expressed some reservations about her ability to be a fair and

unbiased juror, including a statement that she would rather not serve on the jury, which Judge Zoss concluded obviously called her impartiality into question. *Id.* at 18–19. However, Judge Zoss also noted that Phillips stated in voir dire that she had no opinion about Walters's guilt or innocence, that she could put aside any prior impressions, that she would base her verdict on the evidence presented in court, that she would not let her family influence her decisions, and that she would try her best to be fair. *Id.* at 19. Judge Zoss noted that Walters's trial counsel commented, on the basis of his voir dire, that Phillips sounded like she " 'would make a good effort to be impartial.' " *Id.* (quoting trial counsel's comment in the transcript of jury selection).

In the circumstances, Judge Zoss found that Walters's trial counsel had been forced to balance contravening indications and concluded that, "[a]lthough another attorney reasonably might have balanced these factors differently, nothing in the record suggests trial counsel was unreasonable in his ultimate assessment that Phillips would be a fair juror, or at least a better juror than the alternatives." *Id.* Judge Zoss also concluded, based on various precedents, that jury selection is a judgment call by an attorney that should not be second-guessed. *Id.* at 19–20. He further concluded that Walters's testimony that he asked his counsel to strike Phillips did not change the analysis, because the decision to strike or not strike a juror is a non-fundamental decision to be made by counsel on the basis of his or her professional judgment. *Id.* at 20. Ultimately, Judge Zoss concluded as follows:

> Walters's trial counsel considered all of the factors weighing in favor of and against allowing Phillips to remain on the jury, and then compared her qualifications to those of other potential jurors, concluding that he should not use a strike on Phillips. Based on the record

in this case, this was both a reasonable and appropriate conclusion, despite Walters's disagreement with his counsel's theory. *See United States v. Johnson [Johnson v. Lockhart],* 921 F.2d 796, 800 (8th Cir.1990).

> Furthermore, to demonstrate prejudice under the *Strickland* standards, Walters would have to show that Phillips "did indeed harbor actual bias against [him]." *Parker v. Turpin,* 60 F.Supp.2d 1332, 1362 (N.D.Ga.1999) (citing *Rogers v. McMullen,* 673 F.2d 1185, 1189 (11th Cir.1982)). Walters has made no such showing. The court finds trial counsel was not ineffective and Walters was not prejudiced by leaving Phillips on the jury.

*Id.* at 20–21.

In his *pro se* Objection No. 1, far and away the most detailed and extensive objection in these proceedings, Walters argues that Judge Zoss overlooked supportable record evidence showing "implied" or "inferable" bias in juror Phillips, instead considering exclusively the standard for "actual" bias, and because he overlooked this evidence, Judge Zoss did not reach the correct conclusions concerning his trial counsel's ineffectiveness in failing to strike Phillips. Walters therefore lays out in detail the record evidence he believes demonstrates Phillips's implied or inferable bias, including her relationship to the Becks, the effect of pretrial publicity on the jury panel—including the fact that several other panelists admitted that, because of pretrial publicity, they did not believe that they could be fair or had reached a conclusion about Walters's guilt—the effect of pretrial publicity on Phillips, the effect of information received from Phillips's relatives, and inferences concerning the biases arising from pretrial publicity and the victim's prominence reflected in

his trial counsel's motion for a change of venue.

Next, Walters argues that the evidence of bias meets the appropriate legal standards. He contends that the facts, including Phillips's own voir dire responses, demonstrate actual bias so conclusively that Phillips's denials of bias and preconceived conclusions must be discounted. Furthermore, he contends that the record more than adequately demonstrates Phillips's implied or presumed bias, because an average person in her position would be prejudiced, and that Phillips's bias must be inferred, because Phillips disclosed facts that "bespea[k] a risk of partiality sufficiently significant to warrant making a challenge for cause, but not so great as to make mandatory a presumption of bias." Petitioner's *Pro Se* Objections at 16–17. In these circumstances, Walters again argues that Phillips's own statements that she believed she could be impartial are irrelevant.

Finally, turning to the question of whether his trial counsel was ineffective, Walters acknowledges that jury selection is a strategic choice that falls within the wide range of reasonable professional assistance required of counsel. Nevertheless, he argues that, "where a strong possibility for bias is revealed it must be concluded that reasonably competent practitioners would exercise a challenge for cause or use a peremptory strike against such a panelist." *Id.* at 19. He argues that, under the circumstances, trial counsel's reasons for not striking Phillips do not demonstrate any sound or appreciable trial strategy. In essence, Walters argues that the circumstances demonstrating Phillips's bias are so egregious that counsel could not have performed competently by leaving her on the jury.

In another objection related to this issue, Petitioner's *Pro Se* Objection No. 5,

Walters objects to Judge Zoss's use of only those portions of the record supporting his limited findings on the bias of juror Phillips. He therefore offers his own appendix of record evidence, which he contends demonstrates that he did not acquiesce in counsel's decision to leave Phillips on the jury and that many of the prospective jurors admitted to bias and prejudice.

### b. Prongs of the "ineffective assistance" analysis

Like any other claim of ineffective assistance of counsel, a claim that counsel was ineffective in jury selection is subject to the requirements of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Johnson v. Norris,* 207 F.3d 515, 517 & 520–21 (8th Cir.) (alleged ineffective assistance in jury selection), *cert. denied,* 531 U.S. 886, 121 S.Ct. 205, 148 L.Ed.2d 144 (2000); *White v. Helling,* 194 F.3d 937, 940–41 (8th Cir. 1999) (alleged ineffective assistance in failing to strike a juror or to examine a spectator, who was a relative of the victim, with whom the juror was seen conversing); *Cox v. Norris,* 133 F.3d 565, 573–74 (8th Cir.1997) (alleged ineffective assistance in alienating a juror), *cert. denied,* 525 U.S. 834, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998); *Goeders v. Hundley,* 59 F.3d 73, 75 (8th Cir.1995) (alleged ineffective assistance in failing to strike a juror with a familial relationship to the victim). Therefore, to uphold Walters's claim, the court "must find that the counsel's performance was seriously deficient, and that the ineffective performance prejudiced the defense." *Johnson,* 207 F.3d at 517; *White,* 194 F.3d at 940; *Cox,* 133 F.3d at 573; *Goeders,* 59 F.3d at 75. If it is easier to dispose of an "ineffective assistance" claim on the "prejudice" prong of the analysis, however, the court may do so, without consideration of whether or not counsel's performance met professional standards, because " '[t]he ob-

ject of an ineffectiveness claim is not to grade counsel's performance.'" *Goeders,* 59 F.3d at 75 (quoting *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052).

**i. *Professional performance.*** As to the first prong of the ineffective assistance analysis, the "professional performance" prong, the court's "initial inquiry is whether counsel's omission caused his representation of [the petitioner] to fall below acceptable professional standards." *White,* 194 F.3d at 941 (citing *Strickland*); *Cox,* 133 F.3d at 573 ("With respect to attorney performance, we must determine whether, in light of all the circumstances, the lawyer's performance was outside the range of professionally competent assistance.") (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). In making this determination, the Eighth Circuit Court of Appeals has observed, "We must resist the temptation to use hindsight to require that counsel's performance have been perfect. Only reasonable competence, the sort expected of the 'ordinary fallible lawyer' ... is demanded by the Sixth Amendment." *White,* 194 F.3d at 941 (internal citation omitted) (quoting *Nolan v. Armontrout,* 973 F.2d 615, 618 (8th Cir.1992)). Applying this standard, in *White,* the Eighth Circuit Court of Appeals rejected the petitioner's contention that counsel had performed below professional standards by failing to call a spectator, with whom a prospective juror was seen talking, to testify in chambers about the circumstances and content of the conversation, after the juror was interviewed in chambers, where it was discovered that the spectator was a sister of one of the men the petitioner was on trial for murdering. *Id.* In rejecting the "ineffective assistance of counsel" claim, the court adopted the conclusion of the Iowa Court of Appeals, on the petitioner's post-conviction relief application, that, " '[w]hile petitioner's brief indicates certain aspects of this issue could have been handled more favorably for petitioner, we are unwilling

to find that trial counsel's conduct was outside the bounds of normal competency.'" *Id.* (quoting *White v. State,* 380 N.W.2d 1, 5 (Iowa Ct.App.1985)). Thus, the question here is whether the conduct of Walters's trial counsel in voir dire of juror Edna Phillips fell "outside the bounds of normal competency." *Id.* The court concludes that it did not.

Walters relies on *Johnson v. Armontrout,* 961 F.2d 748 (8th Cir.1992), for the proposition that, "[a]bsent the showing of a strategic decision, failure to request the removal of a biased juror can constitute ineffective assistance of counsel." *Johnson,* 961 F.2d at 755. In *Johnson,* the court found that counsel's performance was "clearly deficient" where he failed to strike or even to question during jury selection four jury members who had heard damaging testimony about the petitioner in a previous trial of another defendant. *Id.* The court rejected the respondent's argument that counsel's failure to request the removal of the jurors for cause was a "strategic" decision, because trial counsel had erroneously told the petitioner that he was unable to use for-cause strikes to remove the jurors in question and counsel had already used five valuable peremptory strikes to remove other prospective jurors who had heard damaging testimony against the petitioner in the prior trial. *Id.*

■ In Walters's case, however, there *is* a basis for concluding that trial counsel's decision not to strike Edna Phillips from the jury or to request her removal for cause *was* strategic, thus distinguishing Walters's case from the circumstances in *Johnson.* As Judge Zoss noted, Walters's trial counsel testified in Walters's post-conviction relief proceedings as follows:

> I didn't challenge her because I didn't feel the grounds were there, and I felt if I tried and failed, it might—it's going to

leave an unhappy juror, and I felt the grounds weren't even close, so I didn't. When we were going over our strikes— It was a tough jury panel there. There were lots of folks that we needed to get off. Ernie was actively involved in that process. He had taken notes. We reviewed them. We made decisions together on who to leave and who to take off.

I guess the reason I didn't strike Edna Phillips is because she seemed to me that she was going to bend over backwards to attempt to be fair. And the other thing that I recall about Ms. Phillips is that she did not like guns, and I felt that that might be helpful in the context of our defense where we knew that the Becks had escalated the situation from Mr. Walters simply going in to get his son by pulling shotguns off the wall. I hoped that would work in our favor.

Transcript of Post–Conviction Relief Proceedings at p. 37, ¶ 10, to p. 38, ¶ 2. Whether or not Walters now contends that the grounds *were* there to challenge Edna Phillips for cause and that he did *not* agree not to strike her, this court cannot find that counsel's failure to strike Phillips "caused his representation of [Walters] to fall below acceptable professional standards," *White*, 194 F.3d at 941, or that "in light of all the circumstances, the lawyer's performance was outside the range of professionally competent assistance," *Cox*, 133 F.3d at 573, where counsel evaluated his options to request that Phillips be removed for cause or to strike her from the panel, and the consequences of doing so, and he reasonably concluded that she was a preferable juror to others in the pool. *Com-*

*pare Johnson*, 961 F.2d at 755 (no reasonable strategy existed for failure even to attempt to remove tainted jurors).[5]

Walters's evidence that several other jurors admitted that they had formed opinions in the case or admitted bias against Walters, in an attempt to show that Phillips must have been biased too and should have been removed, actually undercuts his argument that counsel acted unprofessionally. That evidence demonstrates resoundingly why counsel would prefer to leave on the jury a prospective juror who had shown a conscientious intent to decide the case only on the basis of the evidence and to overcome or ignore any information or influences from other sources, as Phillips's answers in voir dire indicated she would try to do. Thus, Walters's claim of ineffective assistance with regard to jury selection fails on the first prong of the *Strickland* analysis.

*ii. Prejudice.* The court will nevertheless consider *de novo* the second prong of the analysis, assuming, for the sake of argument—and contrary to this court's finding—that Walters's trial counsel acted unprofessionally. On that second prong, which considers "prejudice" to the petitioner arising from counsel's unprofessional conduct, Walters "must show that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *Cox*, 133 F.3d at 573 (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052); *Goeders*, 59 F.3d at 75 (also citing *Strickland*). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052);

---

**5.** The court believes that the better course would have been for *the trial court* never to have placed Walters's counsel in a position where he was forced to consider whether or not to strike or to try to remove for cause a

juror with some familial relationship to a murder victim, however remote. No claim that the trial court erred in this respect is presently before the court, however.

*Goeders,* 59 F.3d at 75 (quoting this definition from *Strickland* ).

The recent decision of the Eighth Circuit Court of Appeals in *Johnson v. Norris,* 207 F.3d 515 (8th Cir.), *cert. denied,* 531 U.S. 886, 121 S.Ct. 205, 148 L.Ed.2d 144 (2000), is instructive on this second prong of the analysis. In that case, the petitioner argued that his trial counsel was ineffective in jury selection in his capital murder case, because his only discernible trial strategy was to seat an all-Catholic jury and he failed to question every potential juror about prior jury service, which resulted in the selection for service on the petitioner's jury of four jurors (one an alternate) who had imposed the death sentence in another capital case the week before. *Johnson,* 207 F.3d at 520. However, the court rejected the petitioner's claim, even assuming that the supposed "trial strategy" was unprofessional:

Mr. Smith believed that the religious beliefs of Roman Catholics would make them less likely to impose the death sentence. During the sentencing phase of the case, he appealed to what he supposed to be the jurors' religious convictions. *We assume for present purposes that this strategy, if it was worthy of the name, was seriously unprofessional.* The assumption that every Roman Catholic is opposed to the death penalty, we think, is an unreasonable stereotype. *The difficulty with the argument is that no prejudice can possibly be shown. We have no way of knowing who would have gotten on the jury if counsel had adopted a different strategy during voir dire, or if these hypothetical jurors would have been more favorable to petitioner.*

*The same reasoning applies to counsel's conduct in allowing three jurors to sit on petitioner's jury who had served on a jury that returned a death sentence the previous week. We have no trouble agreeing that no reasonable lawyer* would have allowed this to happen, at least without making some kind of a record. There is absolutely no showing, however, that the three jurors in question were unfair to petitioner. We are unwilling to assume that someone who votes to sentence A to death will necessarily be inclined to impose the same sentence on B. The jurors' previous service does show that they were willing to impose a death sentence, but jurors absolutely unwilling to impose such a penalty are not qualified to sit. *Neither the "Catholic strategy" nor the failure to challenge the jurors who had previously served can be shown to have had anything to do with the actual conduct of the jury in petitioner's case. In short, there is no reasonable likelihood that the result of petitioner's trial would have been different if counsel had behaved more prudently.*

*Johnson,* 207 F.3d at 520–21 (emphasis added). In summary of its denial of all of the petitioner's claims of ineffective assistance of counsel, the court commented on the specificity with which a *habeas* petitioner must demonstrate prejudice:

This is in many ways an unfortunate case. Petitioner has been sentenced to death. The lawyer who tried his case may have been mentally ill at the time, failed to press vigorously for the admission of certain defense testimony, and pursued unprofessional strategies during jury selection. We nevertheless are convinced that the governing law requires that this conviction and sentence be upheld. *We deal in specific facts, not abstractions, and petitioner has failed to show any reasonable likelihood that the outcome of this case would have been different even if his lawyer had conducted himself perfectly.* Accordingly, it is our duty to reject the petitioner's three contentions on appeal, and the

judgment of the District Court is affirmed.

*Johnson,* 207 F.3d at 521 (emphasis added); *see also Cox,* 133 F.3d at 572 & 574 (assuming that counsel had acted "outside the realm of professional competence" in attempting to provoke a juror into an outburst that would get the juror removed for cause, where counsel had no more peremptory challenges, the court found no prejudice, because "the evidence against [the petitioner] was overwhelming").

■ Similarly here, "[w]e have no way of knowing who would have gotten on the jury" if Edna Phillips had been removed for cause or by a peremptory challenge, or if the "hypothetical juror" to replace her "would have been more favorable to petitioner." *Johnson,* 207 F.3d at 520. If anything, Walters has himself demonstrated the likelihood that other jurors would have been *less* favorable to him, in light of his evidence that several other jurors admitted to bias or preconceptions about his guilt. Thus, as in *Harris,* "there is no reasonable likelihood that the result of petitioner's trial would have been different if counsel had behaved more prudently"—that is, if counsel had behaved as Walters now contends he should have. *Id.* at 521.

Moreover, the decision of the Eighth Circuit Court of Appeals in *Goeders v. Hundley,* 59 F.3d 73 (8th Cir.1995), answers a number of Walters's arguments concerning the "prejudice" prong of the analysis. *Goeders* was a case involving alleged ineffectiveness of counsel in failing to strike from the jury a juror who stated in voir dire that his ex-wife was the niece of the man the petitioner had allegedly murdered. *Goeders,* 59 F.3d at 74. In *Goeders,* the court formulated the second prong of the "ineffective assistance" analysis as requiring the petitioner to show "a reasonable probability that the result of the proceeding would have been different had [the juror in question] not been on the jury." *Id.* at 75. The court explained further, "To maintain a claim that a biased juror prejudiced him, [the petitioner] must show that the juror was *actually biased* against him." *Id.* (citing *Smith v. Phillips,* 455 U.S. 209, 215, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)) (emphasis added). This was so, even though the petitioner argued in that case, as Walters does here, that the court should find "implied bias," and thus that he need not show "actual bias." *Id.* The petitioner in *Goeders* relied on *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), for this argument. *See Goeders,* 59 F.3d at 75. The court found that *"Phillips,* however, supports the opposite proposition: that [the petitioner] must show actual bias." *Id.*

In *Phillips,* the Supreme Court examined cases treating claims of implied juror bias, and rejected implied bias in cases of alleged juror bias. 455 U.S. at 215–17, 102 S.Ct. at 944–46. Instead, "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Id.* at 215, 102 S.Ct. at 945. Just such a hearing was held by the state court on postconviction review in this case, and, on the basis of this hearing, the state court denied Goeders' petition for postconviction review. Although the order denying postconviction review is unfortunately not in the record before this Court, it is clear from the transcript of the hearing that the central issue before the state court was whether Hurlburt was biased. Because Goeders' claim on review was that his counsel was ineffective in conducting voir dire, and because this claim was based entirely on the premise that Hurlburt was biased, we assume that the state court made the finding necessary to the denial of Goe-

ders' ineffective assistance claim: that Hurlburt was not actually biased.

*Goeders,* 59 F.3d at 76.

In Walters's case, Walters apparently has not asserted until these proceedings that Edna Phillips was actually biased against him. On direct appeal, where Walters urged that the trial court should have moved his trial further away from Jackson or Linn Counties than Muscatine County, because pretrial publicity had prejudiced the jury, the Iowa Supreme Court noted, "Walters does not attempt to show actual prejudice on the part of the jury. Rather he contends that the publicity attending his case was so pervasive and inflammatory that prejudice must be presumed to exist, even in Muscatine County." *Walters,* 426 N.W.2d at 139. Moreover, in his state post-conviction relief proceedings, where Walters asserted that his trial counsel was ineffective in failing to strike Edna Phillips from the jury, the Iowa District Court also found that "[t]he Petitioner does not attempt to show actual prejudice and consequently the presumption that the juror behaved properly in an accordance with her duties and the instructions of the Court prevails." *Walters v. State,* Law No. 22761, slip op. at 3 (Iowa Dist. Ct. for Jackson County, July 24, 1992) (Post–Conviction Relief Order). Thus, Walters may have waived his contention that Edna Phillips was actually biased.

Even if he has not waived the issue, however, Walters has not made a sufficient showing in these proceedings that Edna Phillips was actually biased. In *Goeders,* the court reviewed the challenged witness's testimony in the post-conviction relief proceedings that he had responded to questions in voir dire by asserting that he believed that he could be fair, and that he felt he had in fact been fair in reaching his verdict. *Goeders,* 59 F.3d at 76. Edna Phillips also stated prior to Walters's trial that she also believed that she could ren-

der a fair verdict, and although she has not been called upon to testify as to whether or not she in fact did so, the court concludes that "[o]ne may not know or altogether understand the imponderables which cause one to think what [s]he thinks, but surely one who is trying as an honest [wo]man to live up to the sanctity of [her] oath is well qualified to say whether [s]he has an unbiased mind in a certain matter." *Id.* at 76 (internal quotation marks omitted) (quoting *Phillips,* 455 U.S. at 217 n. 7, 102 S.Ct. 940, in turn quoting *Dennis v. United States,* 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950)).

Moreover, in *Goeders,* the court rejected the "litany of connections between [the juror] and the victim" recited by the petitioner as insufficient to show actual bias in light of the juror's testimony that he could be impartial. *Id.* at 77. Those connections, in addition to the fact that the juror's ex-wife was the murder victim's niece, included the following: the juror lived next door to the victim for three to six months; the juror went to the victim's funeral; the juror taught the victim's children at the school where he was a teacher, although he was not sure how many children the victim had; he saw or spoke to the victim occasionally; he had met the victim's wife a few times; and he frequently met the victim's sister, not because of the familial relationship, but because she ran a café he frequented. *Id.* at 77. In Walters's case, the relationship between Edna Phillips and the murder victim's family is much more tenuous, and at most, is similar to the connections many people in Muscatine County would have had. *See id.* (the juror's "connections with the victim were those which many people in the town of Pocahontas may have had").

The difference here, Walters's assertions suggest, is the effect of inflammatory pretrial publicity. However, in this regard,

the Iowa Supreme Court concluded that "the record does not disclose, as [Walters] would have it, sensational reporting of a routine crime. Rather, there was routine reporting of a sensational crime." *Walters*, 426 N.W.2d at 139.

> We find nothing in the news coverage which went beyond direct relating of unvarnished facts.
>
> There is no evidence that the newspaper articles or television and radio broadcasts were unfair or inaccurate. There were no editorial denunciations of the defendant, nor did any articles or broadcasts state that the defendant was guilty of the crimes with which he was charged. Most of the stories ran shortly after the crime occurred and the defendant was arrested; coverage then dropped off.

*Walters*, 426 N.W.2d at 140. Although these factual findings regarding the nature of pretrial publicity were made in the context of Walters's argument, on direct appeal, regarding abuse of discretion by the trial court in changing venue from Jackson to Muscatine County, instead of further away, they are nevertheless directly relevant here to his present "ineffective assistance" claim—as they were relevant to the venue issues on his direct appeal—and they are "presumed to be correct" for purposes of Walters's *habeas corpus* action. *See* 28 U.S.C. § 2254(e)(1). Thus, Walters cannot establish "actual bias" of Edna Phillips on the basis of pretrial publicity, just as he cannot establish such bias on the basis of her remote connections to the murder victim's family.

Walters nevertheless asserts that he was prejudiced, and that he need not show "actual bias," only "implied" or "inferable" bias, again citing *Johnson v. Armontrout*, 961 F.2d 748 (8th Cir.1992). The Eighth Circuit Court of Appeals held in *Johnson* that "even without a showing of actual bias, prejudice may be implied in certain

egregious situations," *Johnson*, 961 F.2d at 756 (citing *Phillips*, 455 U.S. at 222, 102 S.Ct. 940 (O'Connor, J., concurring)). However, the court in *Johnson* declined to discuss what might constitute such egregious situations supporting a finding of implied prejudice, or whether such a situation existed in that case, because the court had found actual bias. *Id.* In contrast, in Walters's case, the court cannot find "actual bias," as explained above. For many of the same reasons that the court concluded that Walters's showing of "actual bias" is totally deficient, the court also concludes that Walters has not identified an "egregious situation" in which bias may properly be implied—even assuming implied bias of a juror would be sufficient to satisfy the "prejudice" prong of the ineffective assistance analysis. Moreover, this court finds inapplicable here the conclusion of the court in *Johnson* "that, in the absence of a strategic motive, a defendant whose attorney fails to attempt to remove biased persons from a jury panel is prejudiced," *id.* at 755–56, because, as explained above, Walters's counsel did have a reasonable strategic motive for not striking Edna Phillips from the jury or attempting to remove her for cause.

Finally, as in *Johnson v. Norris*, 207 F.3d 515, 520–21 (8th Cir.2000), and *Cox v. Norris*, 133 F.3d 565, 574 (8th Cir.1997), the court in *Goeders* also concluded that, "*regardless of [the juror's] impartiality*, the case against Goeders appears, from the limited record before us, to have been very strong." *Id.* at 77. Indeed, in *Goeders*, the court concluded that the "evidence against Goeders is so strong that the outcome of this case could hardly have been other than a verdict of guilty, and therefore Goeders has not shown that [the challenged juror's] presence on the jury had an effect on the result in this case." *Id.* Thus, the court in *Goeders* also rejected the petitioner's "ineffective assistance"

claim concerning failure to strike a juror from the jury on the ground that the evidence against the petitioner was so strong that he had not been "prejudiced," even if the juror was not impartial. That is also the situation in Walters's case, because the evidence shown in the complete record available to the court is so overwhelming on each of the charges against Walters that the verdict in the case could hardly have been anything other than guilty on each of the charges against him. *Id.*

Nevertheless, the court has some discomfort with an overbroad principle that a biased juror presents no prejudice to a criminal defendant if there is overwhelming evidence of the defendant's guilt. *Cf. Johnson,* 207 F.3d at 521; *Cox,* 133 F.3d at 574; *Goeders,* 59 F.3d at 77. As Judge Magill eloquently explained in *Johnson v. Armontrout,*

> [I]t is clear that Johnson was prejudiced by the appearance of two biased persons on his jury. It affords the defendant no comfort to argue that the other ten jurors were not biased.
>
> A constitutional jury means twelve men as though that number had been specifically named; and it follows that, when reduced to eleven, it ceases to be such a jury quite as effectively as though the number had been reduced to a single person.
>
> *Presley v. State,* 750 S.W.2d [602,] 607 [ (Mo.Ct.App.) (*en banc* ), *cert. denied,* 488 U.S. 975, 109 S.Ct. 514, 102 L.Ed.2d 549 (1988) ] (*quoting Patton v. United States,* 281 U.S. 276, 292, 50 S.Ct. 253, 256, 74 L.Ed. 854 (1930)). The government, nevertheless, argues that seating of the biased jurors did not affect the outcome of the trial and, therefore, there was no showing of prejudice under *Strickland.* This is an assumption we cannot make. Trying a defendant before a biased jury is akin to providing him no trial at all. It constitutes a

fundamental defect in the trial mechanism itself. As the district court noted:

> A defendant charged with a crime is entitled to an unbiased jury and is entitled to a presumption of innocence until such time as he is proven guilty beyond a reasonable doubt. Where you have jurors who before they have heard any evidence are convinced that the defendant is guilty [they are] clearly biased against the defendant. [This] denies the defendant the presumption of innocence and denies him a fair trial. Are only the innocent entitled to an unbiased jury or does the right of due process also entitle the guilty to an impartial trial? This court is of the opinion that both the innocent and the guilty are entitled to start a trial without any member of the jury convinced of the defendant's guilt.
>
> *Johnson v. Armontrout,* No. 90–3426–CV–S–2, slip op. at 7 (W.D. Mo. June 18, 1991)....
>
> In a related argument, the state urges that the seating of the biased jurors constituted harmless error. An error may be harmless when it is merely a trial error. But "structural defects in the constitution of the trial mechanism ... defy analysis by 'harmless error' standards." *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 1264–65, 113 L.Ed.2d 302 (1991). The presence of a biased jury is no less a fundamental structural defect than the presence of a biased judge. *Id.* We find this claim outside the gamut of harmless error analysis.

*Johnson,* 961 F.2d at 755–56. Walters's case is distinguishable, however, because the court cannot find any "structural defect" in the seating of a biased juror, such that Walters was not deprived of a constitutional jury of twelve unbiased persons,

where there is no sufficient evidence that Edna Phillips was actually biased or can be presumed to have been biased against Walters.

Nor does Walters's Objection No. 5 require a different result. In that objection, Walters contends that Judge Zoss used only those portions of the trial court record that supported Judge Zoss's "limited finding" on the bias issue concerning juror Edna Phillips. Walters therefore includes with his objections his own appendices of other portions of the trial record, including his own voir dire notes, which he contends refute the respondent's argument that he acquiesced in trial counsel's decision to leave Phillips on the jury, as well as excerpted portions of the voir dire of panelists who admitted to bias and prejudice. Even in the face of the additional evidence to which Walters points in this objection, counsel's decision to leave Phillips on the jury was neither unprofessional nor prejudicial to Walters. *See Strickland*, 466 U.S. at 690–94, 104 S.Ct. 2052 ("ineffective assistance" claim requires proof of both unprofessional conduct and prejudice).

Therefore, the court will accept Judge Zoss's recommendation that relief be denied on ground 1.

### 2. Ineffective assistance concerning insufficiencies in the trial information

The remaining grounds for relief asserted in Walters's "Recasted Petition" involve the ineffective assistance of trial and appellate counsel in failing to argue that the trial information provided insufficient notice of the burglary and felony murder charges against Walters. These issues were briefed by Walters's *habeas* counsel and counsel filed the objections to Judge Zoss's recommendation that relief be denied on these grounds.

### a. Characterization of the claims

Judge Zoss characterized these claims as follows:

6. Walters's trial counsel was ineffective in failing to argue the felony underlying Count II of the indictment (first degree burglary) "was not defined or identified until the jury instructions were given."

7(a). Trial counsel was ineffective for failing to argue "lack of sufficient notice" in Count I of the indictment, the killing of Bob Beck.

7(b). Appellate counsel was ineffective for failing to preserve a claim that trial counsel was ineffective for failing to argue "lack of sufficient notice" in Counts I and II of the indictment.

Report and Recommendation at 4–5. Although neither Walters nor his *habeas* counsel objected to these characterizations of the claims, the court finds that these characterizations do not match the way the claims were pleaded or argued by Walters's *habeas* counsel.

Grounds Six and Seven of Walters's "Recasted Petition" alleged the following:

F. GROUND SIX: This conviction and sentence constitutes violation [sic] of the Fifth, Sixth, Ninth and Fourteenth Amendments to the United States Constitution.

SUPPORTING FACTS:

The Defendant was charged in Count II with First Degree Burglary. The indictment charged (in part) "having the intent to commit a felony..." The actual "felony" was not defined or identified until the jury instructions were given. Defense counsel did not move to require the state to identify the "felony" that would be satisfying these elements. Appellate counsel

was ineffective in failing to argue this issue.

 G. GROUND SEVEN: This conviction and sentence constitutes violation [sic] of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

SUPPORTING FACTS:

 In Count I the Defendant was charged with killing Bob Beck while participating in the forcible felony of burglary in the first degree. As described in Ground No. 7 [sic: 6?], there was a lack of sufficient notice in Count II, and therefore a lack of successful notice in Count I. Trial and Appellate Counsel were both ineffective in not preserving an[d]/or presenting this issue.

"Recasted Petition" at ¶¶ F & G.

It appears to the court that the gravamen of these claims as pleaded was not the ineffective assistance of trial and/or appellate counsel, but the constitutional insufficiency of the notice of the charges in Counts I and II. In the court's reading, the references *in the supporting facts* to conduct of trial and appellate counsel are an attempt by Walters to show "cause and prejudice" for failing to assert these claims in state proceedings. Furthermore, Walters's *habeas* counsel never argued in his written submissions that the claims were premised on—or that the facts demonstrated—ineffective assistance of counsel, nor did counsel ever so much as refer to the *Strickland* standard for determining ineffective assistance of counsel as dispositive of the claim.[6] Rather, Walters's counsel's written submissions argue the merits of the claims almost exclusively on the ground that the trial information gave constitutionally deficient notice of the charges against Walters. Similarly, in Petitioner's Counsel's Objections there is but one passing reference to ineffective assistance of counsel with regard to these claims, in the "Wherefore" clause, which is a "reques[t] that the Court not adopt those Reports and Recommendations and find that the record does show that Plaintiff Ernie Walters had ineffective assistance of counsel and a lack of notice of what he was being charged in." Petitioner's Counsel's Objections at 5. This reference by counsel to an "ineffective assistance" claim concerning the insufficiency of the trial information, but only in objections to the Report and Recommendation, must be read in the context of *respondent's* arguments concerning the merits of these claims as "ineffective assistance" claims and Judge Zoss's treatment of these claims in like manner.

The explanation for the discrepancy, however, demonstrates that Walters has no cause for complaint. After stating what Walters identifies in these proceedings as the deficiencies of the trial information under Iowa law, Judge Zoss commented, "Because these questions were not raised in Walters's direct appeal, he raises them in the form of a claim that his trial and appellate counsel were ineffective for not raising these issues." Report and Recommendation at 25. Thus, Judge Zoss's characterization of the claims actually attempted to "save" them for review in these proceedings, albeit without necessarily considering whether all of the steps for consideration of an "ineffective assistance" claim in a federal *habeas* action had been satisfied.

---

6. *Habeas* counsel's one reference to *Strickland* in his briefing of these claims was to note the reference to *Strickland* in *Sheppard v. Rees*, 909 F.2d 1234, 1237 (9th Cir.1989). *See* Petitioner's Counsel's Brief at 12. Walters's counsel argued that, in *Sheppard*, the court relied on *Strickland* to demonstrate how adequate notice of the prosecution's theory "directly implicates" the right to effective assistance of counsel. *Id.*

The court agrees that, in light of Walters's failure to challenge the sufficiency of the trial information on direct appeal, the only appropriate avenue for federal *habeas* review of that issue is by way of a claim of ineffective assistance of counsel, that is, by establishing ineffective assistance of counsel as "cause and prejudice" for failure to exhaust the issue on direct appeal in state proceedings. As this court recently explained,

> A federal habeas petitioner can overcome a procedural default or an abuse of the writ by showing cause and prejudice, *see McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), or by showing "that a fundamental miscarriage of justice would result from a failure to entertain the claim," *id.* at 495, 111 S.Ct. 1454. To establish cause for his procedural default, [the petitioner] must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). In proceedings in which the Sixth Amendment requires legal representation, ineffective

assistance of counsel is cause for a procedural default. *See id.*

*Tunstall v. Hopkins*, —— F.Supp.2d ——, 2001 WL 720636, *14 (N.D.Iowa June 21, 2001).[7] Thus, the court can reach the merits of the claim that the trial information was constitutionally deficient, as asserted by Walters's *habeas* counsel, only if the court finds first that ineffective assistance of counsel prevented Walters from asserting that claim on direct appeal.

However, the court also finds that a claim concerning insufficiency of the trial information *was* asserted in Walters's post-conviction relief proceedings *as a claim of "ineffective assistance of counsel."* In those proceedings, the Iowa District Court wrote,

> The primary issue raised is the claim that the attorney representing the Petitioner at the trial should have procured the dismissal of the first degree burglary count on the ground that the trial information charged under Count II the commission of the first degree burglary in three alternative ways: (1) intent to commit a felony; or (2) an assault; or (3) a theft. He claims that the Petitioner was taken by unconscionable surprise

---

7. There is a similar rule in Iowa regarding preservation of issues for review in state post-conviction relief proceedings. As the Iowa Supreme Court recently explained,

> [B]efore we can grant Jose's application for postconviction relief, we must find he preserved error on his ineffective assistance of trial counsel claim. Jose did not raise the issue of trial counsel's ineffective assistance in his direct appeal of his conviction. However, we have held the ineffective assistance of appellate counsel constitutes a sufficient reason for an applicant not raising an issue on direct appeal. Iowa Code § 822.8 (1995); *Berryhill [v. State]*, 603 N.W.2d [243,] 245 [ (Iowa 1999) ]; *Osborn [v. State]*, 573 N.W.2d [917,] 921 (Iowa 1998) ; *Washington [v. Scurr]*, 304 N.W.2d [231,] 234 [ (Iowa 1981) ]. For Jose to have preserved error on his ineffective assistance

> of trial counsel claim, we must find his appellate counsel ineffective for failing to raise this issue on direct appeal.
>
> We find Jose's appellate counsel performed deficiently when she advised Jose that he could raise the ineffective assistance of trial counsel issue in postconviction relief proceedings. This statement was a misstatement of the law under Iowa Code section 822.8. Any reasonably competent attorney engaged in criminal appellate practice would find appellate counsel's advice to be clearly erroneous. Because we held Jose's ineffective assistance of trial counsel claim to be successful, appellate counsel prejudiced Jose by not bringing the claim on direct appeal. Thus, Jose adequately preserved error.

*Ledezma v. State*, 626 N.W.2d 134, 152 (Iowa 2001).

to find out that the felony relied upon by the State in alleging the felony alternative was the kidnapping of Cheryl Beck. He claims therefore that he was deprived of due process under the Sixth and Fourteenth Amendments. He claims a violation of his Sixth Amendment rights of being notified of the charges against him.

*See* Post-Conviction Relief Order at 1–2. The state court rejected this "ineffective assistance" claim, because the court determined that Walters received constitutionally sufficient notice of the charges against him—which eliminates any contention that counsel was ineffective for failing to argue otherwise. *Id.* at 2–3. The Iowa Supreme Court dismissed as frivolous Walters's appeal of denial of his petition for post-conviction relief without a written opinion. *Walters v. State*, No. 92–1298, Order (Iowa March 15, 1993). Thus, a claim that Walters's trial counsel was ineffective for failing to challenge deficiencies in the trial information was fully exhausted.

Because the "ineffective assistance" claim was exhausted in Walters's post-conviction relief proceedings, the court turns to Judge Zoss's analysis of that claim and Walters's *habeas* counsel's objections to Judge Zoss's recommendation that relief be denied on that and related claims.

#### b. *Recommended findings and disposition*

Recognizing the interrelationship among Walters's last three claims of ineffective assistance of trial and appellate counsel, Judge Zoss analyzed the claims as a group, rather than individually. Judge Zoss recognized that a determination that Walters received sufficient notice of the burglary charge would also defeat Walters's claim that the notice of the felony murder charge—premised on murder during the commission of the felony burglary—was also deficient. Moreover, implicit in Judge Zoss's ruling is the conclusion that, if trial

counsel was not ineffective for failing to raise the issue of the sufficiency of the trial information, because there was no such insufficiency, then neither was appellate counsel. No party has objected to the form of Judge Zoss's analysis and, under the circumstances, the court finds that it was appropriate.

Judge Zoss began his analysis with an examination of the statement of the charges against Walters in the trial information, the statutory basis for those charges, and the manner in which the jury was instructed on them. Report and Recommendation at 25–28. For example, Judge Zoss noted that IOWA CODE § 707.2(2) defines first-degree murder as including killing another person "while participating in a forcible felony," *i.e.,* felony murder, and that Count I of the trial information against Walters charged him with killing Robert Beck "while participating in the forcible felony of burglary in the first degree." *Id.* at 25–26. Judge Zoss also noted that Count II of the trial information charged Walters with burglary. *Id.* Furthermore, Judge Zoss found that IOWA CODE § 713.1 (1985) defines burglary as requiring proof that the person charged entered the premises " 'having the intent to commit a felony, assault or theft therein.' " *See* Report and Recommendation at 26 (quoting the statute). Judge Zoss concluded that, "Under these statutes, and under the instructions of the court, the jury was told to find Walters guilty of burglary in the first degree, as charged in Count II of the trial information, only if the State proved beyond a reasonable doubt the following: (a) Walters entered an occupied structure (*i.e.,* the Beck residence) that was not open to the public, with no right, license, or privilege to do so; (b) he did so with the intent to commit one of the following three crimes: (1) the kidnap of Cheryl Beck, (2) a theft, or (3) an assault; and (c) at the time he entered the

Beck residence, he had in his possession a dangerous weapon." Report and Recommendation at 28.

Judge Zoss then summarized Walters's arguments as follows:

> Walters claims that until the instructions were read to the jury, he did not know the kidnapping of Cheryl Beck was the "felony" the State was alleging he intended to commit at the time he entered the Beck residence. He claims this lack of notice violated his due process rights under the United States Constitution for the following reasons: (a) he was not put on sufficient notice, until it was too late, of what the State intended to prove, so that he could mount an effective defense and determine "what witnesses to call, what would be the relevant evidence, what questions to ask, what theories of defense to assert in questioning witnesses" (Doc. No. 36, p. 14); (b) the record does not provide any reasonable support for a finding that he intended to kidnap Cheryl Beck when he entered the residence; and (c) the constitutional defect in Count II also infected Count I, because to satisfy the "forcible felony" requirement of Count I, the State was required to prove Walters's guilt of burglary in the first degree, as charged in Count II.

Report and Recommendation at 28–29 (footnote omitted). Judge Zoss added that, according to Walters, his intent when he entered the Beck residence was to take only his son with him, and Cheryl Beck came along voluntarily. *Id.* at 29 n. 11.

The properly exhausted claim before the court was the claim of "ineffective assistance" of counsel—*i.e.,* the claim that trial and appellate counsel were ineffective in failing to assert the insufficiency of the trial information, which Judge Zoss analyzed in terms of "sufficiency of notice." *See* Report and Recommendation at 29–31. Judge Zoss concluded that there was no

evidence in the record to support the argument that Walters was surprised that the kidnapping of Cheryl Beck was the felony underlying the burglary charge in Count II; hence, trial and appellate counsel were not ineffective for failing to argue insufficiency of notice as to either Count II or Count I, which also involved the burglary charge as the felony underlying the felony murder charge. *Id.* More specifically, Judge Zoss first rejected as inconsistent with the record Walters's contention that he had insufficient notice that the kidnapping of Cheryl Beck was the "felony, assault or theft" at issue in the burglary charge, and if he had known, he would have tried the case differently. Report and Recommendation at 29. Instead, Judge Zoss focused on testimony of Walters's trial counsel in the post-conviction relief proceedings that trial counsel was well aware that the kidnapping of Cheryl Beck was the "felony" upon which the burglary charge was predicated. *Id.* at 29–30. Judge Zoss agreed with the state court in Walters's post-conviction relief proceedings that trial counsel was not taken by surprise and that the claim of lack of notice lacked any support whatsoever in the evidence. *Id.* at 31. Therefore, Judge Zoss concluded that nothing in the record suggests that Walters's trial or appellate counsel had failed the "professional performance" prong of the *Strickland* analysis by failing to argue or preserve the issue of the insufficiency of notice in the trial information. *Id.* Consequently, Judge Zoss found it unnecessary to reach the "prejudice" prong of the *Strickland* analysis. *Id.*

Plainly, if the trial information provided constitutionally sufficient notice of the charges against Walters, or if Walters otherwise had sufficient notice of the nature of the burglary charge, counsel could not have performed unprofessionally in failing to challenge the sufficiency of the trial information, and Walters cannot satisfy

the first prong of the "ineffective assistance" analysis. Therefore, the part of Judge Zoss's analysis concerning "sufficiency of notice" was clearly pertinent to the "ineffective assistance" claims properly before the court in these proceedings.

Judge Zoss next considered whether there was insufficient evidence in the record to support the kidnapping charge against Walters, in light of Walters's argument that there was insufficient evidence that he had entered the Beck residence with the intent to kidnap Cheryl Beck. Report and Recommendation at 31–33 (subsection b, captioned "Sufficiency of evidence in the record to support kidnapping charge").[8] Judge Zoss apparently understood this to be Walters's counsel's primary contention for *habeas* relief on grounds 6, 7(a), and 7(b). However, nowhere in these proceedings has Walters or his counsel ever asserted that Walters was entitled to relief on the ground that the evidence was insufficient to support his convictions for either kidnapping or burglary. Moreover, focusing on whether or not there was sufficient evidence that Walters entered the Beck residence with the intent to kidnap Cheryl Beck fails to put the evidentiary issue in the context of either the sufficiency of notice in the trial information (the issue on which counsel focused) or the ineffectiveness of counsel in failing to assert the insufficiency of the

trial information (the issue properly before the court).

Reading counsel's contention that there was no evidence that Walters had the intent to kidnap Cheryl Beck when he entered the Beck residence in the context of *habeas* counsel's entire brief, the undersigned understands Walters's *habeas* counsel to be asserting that the lack of such "intent" evidence, and trial counsel's failure to focus on that lack of evidence, demonstrates that trial counsel *did not* have sufficient notice that the kidnapping was the felony underlying the burglary to mount a proper defense, or in counsel's words, "a defense that had a reasonable chance to do the Defendant some good." Petitioner's Counsel's Brief at 17. For example, *habeas* counsel argues that "[p]rior full notice would assist the defense counsel in determining what 'evidentiary dimensions are necessary to meet the prosecution's theory of felony murder,'" *id.* at 12 (quoting *Sheppard v. Rees*, 909 F.2d 1234, 1237 (9th Cir.1989)), and that "[t]here appears to be no focus in the defense presentation/cross-examination to delineate the issue of intent while entering the residence." *Id.* at 17. Throughout his brief, Walters's *habeas* counsel argues that whether or not Walters had the intent to kidnap Cheryl Beck *at the time he entered the residence* is the issue that would have been central to a good defense, had Wal-

---

**8.** Specifically, as to this contention concerning sufficiency of the evidence to support the kidnapping charge, Judge Zoss cited portions of Walters's brief on direct appeal in which he stated, *inter alia*, that "'[o]n June 8, 1985 Cheryl was awakened by Walters, who pointed the gun at her and instructed her to get up, *as he was taking her and Elijah.*'" *Id.* at 32 (quoting Walters's Brief and Argument, filed February 24, 1988, in *State v. Walters*, Sup.Ct. No. 85–1538) (emphasis added by this court). Judge Zoss noted that Walters had accepted in his *pro se* appellate brief the statement of facts in the brief by his appellate counsel. *Id.* at 32 n. 14. Judge Zoss concluded,

Thus, Walters's own recitation of the facts supports a finding that he kidnapped Cheryl Beck from the home of her parents on June 8, 1985, and he had the intent to do so when he entered the Beck residence. There is nothing in the record to support a due process violation based on lack of evidence, so there is no support for an argument that Walters's attorneys were ineffective in not raising this issue. The court finds no constitutional defect in Count II. Report and Recommendation at 33.

ters or his counsel had sufficient notice of the burglary charge. *See, e.g.,* Petitioner's Brief at 13 (beginning counsel's "Argument" with the question, "What was Ernie Walters' intent when he entered the Beck residence on June 8, 1985?").

Whether or not there was evidence that Walters entered the Beck residence with the intent to kidnap Cheryl Beck does not establish or disprove directly either the "unprofessional performance" or "prejudice" prong of the "ineffective assistance" analysis. *See Strickland,* 466 U.S. at 690–94, 104 S.Ct. 2052. The supposed weakness of the evidence of intent, and trial counsel's failure to argue what the evidence showed about Walters's intent at the time he entered the Beck residence, may be suggestive of whether or not Walters's trial counsel actually had sufficient notice of the burglary charge, which is the point at which Walters's *habeas* counsel's analysis of the issue stops. In other words, *habeas* counsel argues that the trial information was constitutionally insufficient, as if proof of that fact alone would establish entitlement to relief, apparently without recognition that such a claim of "insufficient notice" independent of an "ineffective assistance" claim is procedurally defaulted. Walters's *habeas* counsel does not, however, take the next essential step, in the context of the claims properly before the court, by arguing that evidence that trial counsel lacked sufficient notice of the burglary charge may in turn be suggestive of whether trial counsel performed unprofessionally in failing to challenge the sufficiency of the trial information and whether Walters was prejudiced by that unprofessional omission. Only in the context of these issues is the evidence of Walters's intent pertinent to the "ineffective assistance" claims properly before the court. Therefore, on *de novo* review, this court will consider the question of the sufficiency of evidence of Walters's intent to kidnap Cheryl Beck at the time he entered the

Beck residence only in the context of the significance of that issue to an "ineffective assistance" claim, and only if it is necessary to do so to resolve the claim.

Finally, Judge Zoss concluded that, because there was no constitutional defect in Count II of the trial information, Walters's arguments with regard to the deficiency of Count I were also without merit. Report and Recommendation at 33. This analysis does place the sufficiency of Count II in the proper relationship to the sufficiency of Count I, and hence ties together the "ineffective assistance" claims related to failure to challenge the sufficiency of both counts of the trial information.

### c. *Counsel's objections and requisite review*

Walters's *habeas* counsel filed objections concerning Judge Zoss's findings and conclusions with regard to both the issue of "sufficiency of notice" and the issue of "sufficiency of evidence of intent." More specifically, Petitioner's Counsel's Objection No. 1 is an objection to Judge Zoss's finding that Walters's contention that he lacked notice that kidnapping was the "felony" upon which the burglary charge was based was inconsistent with the record. Petitioner's Objection No. 2 is to Judge Zoss's conclusion that Walters had the intent to commit the kidnapping of Cheryl Beck when he entered the Beck residence. The court will address these objections, and conduct a review of the record and Judge Zoss's findings and conclusions, as appropriate. *See* 28 U.S.C. § 636(b)(1). In conducting such a review, the court will keep in mind that the pertinent claims are claims of ineffective assistance of trial and appellate counsel in (1) failing to challenge the sufficiency of notice of the burglary charge in the trial information and (2) failing to challenge the sufficiency of the notice of the felony murder charge result-

ing from insufficiency of notice of the burglary charge. To obtain relief on such claims, the court will also keep in mind that Walters must demonstrate (1) unprofessional performance of counsel and (2) prejudice resulting from such unprofessional performance. *See Strickland,* 466 U.S. at 690–94, 104 S.Ct. 2052.

■ *i. Lack of notice.* In support of his first objection, concerning lack of notice of the burglary charge against Walters, *habeas* counsel argues that the fact that Walters was *charged* with kidnapping Cheryl Beck in Count IV of the trial information does not establish notice that the kidnapping was the felony underlying the burglary charge in Count II. Counsel finds no clear statement from Walters's trial counsel that he had, or acted upon, notice of the underlying felony, because trial counsel's statement that kidnapping was the "only possible felony that was committed in the house" is inconsistent with his further testimony that there were two felonies that allegedly occurred in the house, kidnapping and robbery. Petitioner's Counsel's Objections at 2.

■ To put the court's review of this issue in the proper legal context, the court notes that "[i]t is true that in the context of state proceedings, '[d]ue process requirements may be satisfied if a defendant receives *actual notice* of the charges against him, even if the indictment or information is deficient.'" *Cokeley v. Lockhart,* 951 F.2d 916, 920 (8th Cir.1991) (quoting *Hulstine v. Morris,* 819 F.2d 861, 864 (8th Cir.1987), *cert. denied,* 484 U.S. 1068, 108 S.Ct. 1034, 98 L.Ed.2d 998 (1988), in turn citing *Franklin v. White,* 803 F.2d 416, 417 (8th Cir.1986) (*per curiam* )) (emphasis in the original), *cert. denied,* 506 U.S. 904, 113 S.Ct. 296, 121 L.Ed.2d 220 (1992). Upon *de novo* review, the court finds that Walters's trial counsel had such "actual notice" that the kidnapping of Cheryl Beck was the felony under-

lying the burglary charge, even if the trial information was deficient in that regard, because the court cannot read the sort of confusion *habeas* counsel sees into Walters's trial counsel's testimony in the post-conviction relief proceedings concerning what he understood the underlying felony to be.

Trial counsel's testimony in the post-conviction relief proceedings—extensive portions of which are quoted in the text of and appendices to Judge Zoss's Report and Recommendation—demonstrates that he had "actual notice" and a clear understanding that the kidnapping of Cheryl Beck was the felony underlying the burglary charge. First, trial counsel testified that "[b]y depositions" he had concluded that kidnapping "was the only possible felony that was committed in the house *that I could see.*" Transcript of Post–Conviction Relief Proceedings, p. 28, ¶¶ 2–5 (emphasis added); *see also* Report and Recommendation at 30 n. 13 (quoting Appendix D at 3, in turn quoting the Transcript of Post–Conviction Relief Proceedings). In response to a question about how he knew that the kidnapping was the underlying felony, when the trial information alleged "felony, assault, or theft," trial counsel testified as follows:

I was defending against the kidnapping and the robbery. Those were the two other felonies that *allegedly* occurred at that time. So my—my trial strategy was, on the burglary, to defend against Robbery in the First Degree and the kidnapping of Cheryl Beck as the underlying felonies to the burglary and to also defend against the charge of assault or theft.

*Id.* at p. 30, ¶ 21 to p. 31, ¶ 2 (emphasis added); *see also* Report and Recommendation at 30 n. 13 (quoting Appendix D at 5, in turn quoting the Transcript of Post–Conviction Relief Proceedings). Finally,

the following testimony of trial counsel was solicited on cross-examination by the state:

Q. In the course of preparing for the trial and defending the felony murder and the Burglary One, what felony were you defending against?

A. I was defending against the felonies that were charged, but specifically, I was concerned about the kidnapping of Cheryl Beck.

Q. And that was a charge in the Trial Information?

A. That's correct.

Q. And that was the purpose of your depositions of the—

A. That's correct.

Q. When the marshalling instruction informed the jury that the underlying felony was the kidnap of Miss Beck, was that any surprise to you?

A. No, not at all.

Q. Had that been your strategy through the whole trial?

A. Yes.

Transcript of Post–Conviction Relief Proceedings at p. 38, ¶ 9 to p. 39, ¶ 1; *see also* Report and Recommendation (quoting Appendix D at 7, in turn quoting the Transcript of Post–Conviction Relief Proceedings).

Contrary to *habeas* counsel's contentions, the court finds that it was entirely consistent for trial counsel to recognize that the underlying felonies *alleged* were robbery and the kidnapping of Cheryl Beck and to *believe*, based on depositions, that the kidnapping of Cheryl Beck was the "only possible felony that was committed in the house *that [counsel] could see* " and, further, that the primary felony *against which he had to defend* was the kidnapping of Cheryl Beck. Moreover, trial counsel testified that, in light of the depositions he had taken, he had based his trial strategy on the assumption that the kidnapping of Cheryl Beck was the felony underlying the burglary charge and he was

not surprised that the jury was so instructed. This evidence demonstrates that trial counsel had "actual notice" of the burglary charge, which satisfies due process, even if the trial information was somehow deficient. *See Cokeley*, 951 F.2d at 920. Thus, the portion of Objection No. 1 asserting that Judge Zoss erred by holding that a claim of lack of notice was inconsistent with the record must be overruled, and that objection provides no basis for rejecting or modifying Judge Zoss's Report and Recommendation. Judge Zoss rightly concluded that the record showed that trial counsel had sufficient *actual* notice of the burglary charge, and that, where trial counsel had such actual notice, trial counsel did not perform unprofessionally by failing to challenge the sufficiency of notice in the trial information. *See Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. This court adds—only for the sake of completing the *Strickland* analysis—that, where trial counsel had such actual notice, and acted upon it, it also would not be possible for Walters to prove that he was prejudiced by trial counsel's failure to challenge the sufficiency of notice in the trial information. *Id.* at 694, 104 S.Ct. 2052.

Nevertheless, Walters's *habeas* counsel also contends in his Objection No. 1 that the "strongest argument" that notice was insufficient "is the actual trial transcript," because *habeas* counsel alleges that "there is an *absence* of any indication that trial counsel appreciated the significance of the element of intent to commit the kidnaping *when* Ernest Walters entered into the residence." Petitioner's Counsel's Objections at 2 (emphasis in the original). Thus, *habeas* counsel argues that the record demonstrates that, notwithstanding trial counsel's testimony in post-conviction relief proceedings, trial counsel did not have sufficient "actual notice" of the burglary charge to satisfy due process, the implication being that, in the absence of such

notice, trial counsel should have challenged the sufficiency of the trial information. *Habeas* counsel contends that there is nothing in the record showing an under-standing—or argument to the jury—that the jury could find Walters guilty of kid-napping, but find that he did not have the intent to kidnap Cheryl Beck *when he entered the residence* as required to con-vict him of burglary under Count II (and hence of felony murder based on a killing during commission of a burglary under Count I). *Habeas* counsel contends that the insufficiency of the evidence regarding intent to kidnap when Walters entered the residence, as argued in his Objection No. 2, demonstrates the "critical need for trial counsel to focus on the charged crimes as of the time of entry into the residence." *Id.* at 3. *Habeas* counsel contends that Judge Zoss could not properly rely on the state court's findings in the post-conviction relief proceedings concerning intent to commit kidnapping upon entering the resi-dence, because the state court instead found intent to commit a theft or assault at the time Walters entered the residence, but did not address intent to commit a kidnapping at the time of entry.

Upon *de novo* review, this court con-cludes that this part of *habeas* counsel's Objection No. 1—that is, his objection to Judge Zoss's conclusion that the trial tran-script demonstrates that counsel had actu-al notice that the kidnapping of Cheryl Beck was the felony underlying the bur-glary charge—must be overruled. First, apart from trial counsel's testimony in the post-conviction relief proceedings, the "Minutes of Testimony" provided *actual* notice that the kidnapping of Cheryl Beck was the felony underlying the burglary charge. *See State v. Walters,* Criminal No. 5151, Minutes of Testimony, June 20, 1985. Walters's *habeas* counsel contends, however, that the Minutes do not provide notice that the State was alleging that Walters had the intent to commit the kid-

napping *at the time he entered the Beck residence,* as required by the burglary charge, and that Judge Zoss could not properly rely on the state court's findings in the post-conviction relief proceedings concerning intent to commit kidnapping upon entering the residence, because the state court found that the Minutes gave notice of intent to commit a theft or as-sault at the time Walters entered the resi-dence, but did not address intent to com-mit a kidnapping at the time of entry.

In this regard, the state court found, in pertinent part,

> The minutes of evidence established the acts upon which the State relied [for the burglary charge] which were very clear and under the law the State is limited to the facts set out in the minutes of evi-dence. The fact that the acts supported burglary under more than one theory does not make the accusation less specif-ic. The minutes clearly set forth suffi-cient facts to support the offense of kid-napping of Cheryl Beck as one of the felonies committed on the premises in-volved. There was also substantial evi-dence to support the entry on the prem-ises with the intent to commit a theft and substantial evidence that there was entry with intent to commit an assault. Under the circumstances, the charge was constitutionally sufficient, and the claim of lack of notice lacks any support whatsoever in the evidence.

Post–Conviction Relief Order at 2–3. The court's own reading of the Minutes shows that the state court's findings in this re-gard are not unreasonable.

■■■■ Where, as here, the State plainly provided notice that Walters was charged with burglary and kidnapping and expressly included the intent-to-commit-a-felony option in the burglary charge, and the minutes of evidence show that both charges arose from the same incident—Walters's unauthorized entry into the Beck

residence and removal of Cheryl Beck from that residence—the court cannot find that the State was required to give separate or additional notice that the felony Walters intended at the time of unauthorized entry into the Beck residence, for purposes of the burglary charge, was the kidnapping of Cheryl Beck. This is so, even if the presence or absence of intent to kidnap at the time of entry was then—or appears with the benefit of hindsight to have been—the "fighting issue" on the burglary charge. As the Iowa Supreme Court recently explained,

> In order to sustain a conviction for burglary the State must prove, beyond a reasonable doubt, Lambert had formed the intent to commit an assault at the time of entry. *State v. Finnel*, 515 N.W.2d 41, 42–43 (Iowa 1994); *State v. Morelock*, 164 N.W.2d 819, 822 (Iowa 1969). This element of the offense is seldom susceptible to proof by direct evidence, and is usually established by inference. *Finnel*, 515 N.W.2d at 42; *State v. Olson*, 373 N.W.2d 135, 136 (Iowa 1985). Intent may be derived from actions preceding, or subsequent to, an accused's unauthorized entry, as well as all circumstances attendant thereto. *Finnel*, 515 N.W.2d at 42. The requirement of proof beyond a reasonable doubt is satisfied if it is more likely than not the inference of intent is valid. *Id.; Olson*, 373 N.W.2d at 136.

*State v. Lambert*, 612 N.W.2d at 810, 813–14 (Iowa 2000); *see also In the Interest of W.L.F.*, 2001 WL 103522, *4 (Iowa Ct.App. Feb.7, 2001) (citing *Lambert, Finnel*, and *State v. Olson*, 373 N.W.2d 135, 136 (Iowa 1985)); *State v. Sinclair*, 622 N.W.2d 772, 780 (Iowa Ct.App.2000) (citing *State v. McFarland*, 598 N.W.2d 318, 320–21 (Iowa Ct.App.1999), which also quotes *Finnel*). The minutes in Walters's case identified sufficient evidence of conduct preceding and subsequent to Walters's unauthorized entry into the Beck residence from which an intent to commit the kidnapping of Cheryl Beck at the time of entry could be inferred. *See id.* at 814 (describing circumstances of the unauthorized entry by the defendant into his former girlfriend's residence giving rise to an inference of intent to commit an assault sufficient to sustain his conviction for burglary). Surely more evidence of intent to commit a predicate crime is not required by due process *to give notice* of a burglary charge than is required *to prove* the intent element of the burglary offense. In other words, if the minutes of evidence identify evidence that would suffice to establish intent to commit a predicate offense at the time of unauthorized entry into a residence, then the minutes provide sufficient notice of the intended predicate offense underlying a burglary charge to satisfy due process. That is the case here.[9]

---

[9] The minutes of evidence, however, cannot provide "actual notice" of an offense, or "actual notice" of a predicate offense for a charged offense, if the indictment or trial information provides notice only of some other offense or predicate offense. For example, in *Cokeley v. Lockhart*, 951 F.2d 916 (8th Cir.1991), the Eighth Circuit Court of Appeals concluded that the state could not rely on actual notice that a victim would testify to the occurrence of both sexual intercourse and oral sex as sufficient to provide notice that the state would proceed on theories of both intercourse and deviate sexual activity, where the charging document charged only rape by sexual intercourse, but did not charge the "deviate sexual activity" alternative. *See Cokeley*, 951 F.2d at 920–21. In Walters's case, however, the trial information did not exclude the kidnapping of Cheryl Beck as a predicate offense for the burglary charge, because it charged unauthorized entry "having the intent to commit a felony, an assault or theft." Trial Information, Count II. Thus, the minutes of evidence clarified, but did not expand, the "intent to commit a felony" alternative of the burglary offense charged.

Finally, contrary to *habeas* counsel's contentions, there is evidence from the trial record indicating that "trial counsel appreciated the significance of the element of intent to commit the kidnaping *when* Ernest Walters entered into the residence." Petitioner's Counsel's Objections at 2 (emphasis in the original). In the face of the State's attempts to show that Walters intended to kidnap Cheryl Beck when he entered the residence, Walters's trial counsel tried to generate evidence that Walters had not intended to kidnap Cheryl, but only to get Elijah. Walters's trial counsel elicited from Ruth Corcoran, who had herself been kidnapped by Walters and was present before and after Walters entered the Beck residence, as follows:

Q. And isn't it true that Ernie told you the reason he was going to the house was to get his son?

A. Ernie told me, yes, he was going to get his son.

Q. Did he say anything at all about getting Cheryl?

A. No, I knew nothing of Cheryl.

Q. Now, did he—

A. He told me nothing of Cheryl.

Q. Okay. Did he tell you any names at this point or is he just talking about getting his son?

A. About getting his son.

Q. Okay. And he didn't say anything to you about taking the boy's mother along, too, did he?

A. No.

Trial Transcript, Vol. I, at p. 133, ¶¶ 7–19. Trial counsel also tried to get Cheryl to admit that she consented to accompany Walters in order to stay with Elijah and tried to impeach her trial testimony that she only went with Walters because he had a gun and told her to "come on, get going," with her statement to an investigating offi-

cer that she went along with Walters because he had Elijah and she didn't want Walters to take Elijah alone. *See* Trial Transcript, Vol. III at p. 852, ¶ 7 to p. 855, ¶ 25. Trial counsel also elicited testimony from Walters that his sole purpose on entering the Beck residence had been to try to get Elijah back. *See* Trial Transcript, Vol. IV at p. 1000, ¶¶ 3–4 ("I decided I was very close to the Becks and I thought I would like to try and get my son back."), p. 1001, ¶ 24 to p. 1002, ¶ 4 ("Q. Did you tell Ruth [Corcoran] specifically who you wanted from the house? A. Yes, I stated it very clearly. Q. Who did you want? A. Elijah. Q. Did you want Cheryl? A. No."); pp. 1027–28 (Walters's testimony that he told Cheryl he was leaving and would not wait while she collected some belongings and Cheryl then got in the car without being threatened); pp. 1033–34 (Walters's testimony that he wanted Elijah and did not plan on keeping Cheryl or want her to come along in the first place). Thus, the actual trial transcript demonstrates that the significance of Walters's intent to kidnap Cheryl Beck, or the lack thereof, at the time he entered the premises, was not so lost upon Walters's trial counsel that he plainly lacked constitutionally sufficient notice of the burglary charge. The second part of Walters's *habeas* counsel's first objection—which asserts that Judge Zoss erred by concluding that the trial record demonstrates that counsel had actual notice that the kidnapping of Cheryl Beck was the felony underlying the burglary charge—is therefore also overruled.

*ii. Evidence of intent to kidnap Cheryl Beck.* Petitioner's Counsel's Objection No. 2 is an objection to Judge Zoss's finding that Walters had the intent to kidnap Cheryl. Beck when he entered the Beck residence.[10] However, the court concludes

---

**10.** Specifically, *habeas* counsel contends that the record shows only that Walters entered the residence with the intent to grab his son

and leave, but he was pursued by Cheryl Beck and his flight was impeded by members of the

that this issue is mooted by the court's conclusions upon *de novo* review of whether or not Walters's trial counsel had actual notice that the kidnapping of Cheryl Beck was the predicate offense for the burglary charge. Where there was such "actual notice," there was no due process violation, even if the trial information was deficient. *See Cokeley,* 951 F.2d at 920. Furthermore, where there was no due process violation, trial counsel was not ineffective for failing to challenge the sufficiency of the trial information and Walters was not prejudiced by any such failure. *See Strickland,* 466 U.S. at 690–94, 104 S.Ct. 2052. There is no claim properly before the court challenging the sufficiency of the evidence to sustain Walters's conviction for burglary.

 To the extent that the insufficiency of evidence that Walters intended to kidnap Cheryl Beck at the time he entered the Beck residence might be pertinent to either prong of the "ineffective assistance" analysis, or even relevant to show that there was insufficient evidence to sustain his conviction, upon *de novo* review, the court finds that a contention that the evidence of intent was insufficient is without merit. The court finds that there was sufficient evidence in the record to present a jury question on whether or not Walters intended to kidnap Cheryl Beck at the time he made his unauthorized entry into the Beck residence. As the Iowa Supreme Court noted in *State v. Lambert,* 612

N.W.2d at 810 (Iowa 2000), "This element of the [burglary] offense is seldom susceptible to proof by direct evidence, and is usually established by inference," and it "may be derived from actions preceding, or subsequent to, an accused's unauthorized entry, as well as all circumstances attendant thereto." *Lambert,* 612 N.W.2d at 813 (citing *Finnel,* 515 N.W.2d at 42–43). "The requirement of proof beyond a reasonable doubt is satisfied if it is more likely than not the inference of intent is valid." *Id.* at 813–14. Here, there is sufficient evidence of Walters's conduct preceding and subsequent to his unauthorized entry into the Beck residence from which an intent to commit the kidnapping of Cheryl Beck at the time of entry could be validly inferred, *see id.* at 814—including evidence that Walters had threatened Cheryl with a gun before grabbing her son and had told her to get up and get going, because they were leaving, and that Walters later justified his actions on the ground that he believed that they were all supposed to be together as a family—robbing Walters's contentions of any significance to the "ineffective assistance" analysis and further demonstrating that a rational jury could indeed have found the essential "intent to commit a kidnapping" element of the burglary crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ("[T]he relevant question [upon a claim for *habeas* relief based

Beck family, which changed the circumstances, but not Walters's intent at the time he entered. Although trial counsel may have recognized that he had to defend against all five counts in the trial information, *habeas* counsel contends that trial counsel failed to recognize that he needed to address whether or not Walters had the requisite intent for the burglary charge in Count II (and hence for Count I) at the time that he entered the residence. *Habeas* counsel asks, if it was so clear that the kidnapping was the felony underlying

the burglary charge, why the State did not charge murder in the form of killing another person while participating in a forcible felony under IOWA CODE § 707.2(2) (1985). This omission, *habeas* counsel argues, draws even more attention to the importance of focusing on when Walters had the intent to commit a kidnapping and further supports the conclusion that a person would be surprised to find a jury instruction making kidnapping part of the burglary charge, rather than a direct element of a first-degree felony murder charge.

on insufficiency of the evidence] is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."); *May v. Iowa,* 251 F.3d 713, 716 (8th Cir.2001) (quoting *Jackson* for this standard for a *habeas* petitioner's claim of insufficiency of the evidence).

### III. CONCLUSION

With certain exceptions, none of which is dispositive of any ground for relief asserted in Walters's "Recasted Petition," Walters's objections, both *pro se* and through counsel, to Judge Zoss's February 7, 2001, Report and Recommendation are without merit and will therefore be overruled. On the other hand, upon appropriate review, either *de novo* or "plain error," as required under the circumstances, Judge Zoss's February 7, 2001, Report and Recommendation should be accepted, with certain modifications as stated herein. Somewhat more specifically, for purposes of summarizing the disposition of the petitioner's claims, upon *de novo* review—undertaken in an abundance of caution in light of an ambiguous objection—the court agrees with Judge Zoss that Walters abandoned in these proceedings the grounds for relief identified as 4, 5, and 8 in his "Recasted Petition." Walters failed to identify any factual basis in the record for relief on these grounds, either in briefing of the merits or in objections to the Report and Recommendation, which might have prompted review of these claims, notwithstanding his assertion that changes in the prison library system prevented him from researching the legal issues involved in these claims.

The court also agrees with Judge Zoss, on "plain error" review, that Walters has identified no "clearly established law, as determined by the Supreme Court of the United States," as required by 28 U.S.C. § 2254(d)(1), in support of relief on ground

2, his contention that the trial court improperly denied his request for a jury selection expert. As to Walters's second claim of error by the trial court, that the trial court erred in admitting evidence of an "uncharged crime" of sexual abuse, as asserted in ground 3 of the "Recasted Petition," the court also accepts Judge Zoss's recommendation that relief be denied, but with modifications as identified on *de novo* review. Although Judge Zoss recommended denial of this claim without reaching the question of a due process violation, which he concluded had been procedurally defaulted, the undersigned concludes that evidentiary rulings in state court are reviewable in federal *habeas corpus* proceedings to the extent that the court may consider whether the evidentiary ruling constitutes a violation of due process or other federal constitutional rights. The undersigned also assumes, without deciding, that Walters's due process claim concerning the admission of the sexual abuse evidence was "fairly presented" and "exhausted" in state proceedings. Upon *de novo* review of the merits of the evidentiary question here, the court concludes that the admission of the evidence of sexual abuse did not violate Walters's due process rights, because the evidence "completes the picture" of the crimes charged and had actual probative value beyond any "propensity" effect, and also because Walters can show no prejudice from admission of the evidence, where overwhelming, independent evidence established his guilt on all of the crimes charged.

Turning to alleged errors by trial and appellate counsel, the court concludes upon *de novo* review that Walters's grounds for relief 1, 6, 7(a), and 7(b) fare no better. As to ground 1, Walters's contention that trial counsel was ineffective for failing to challenge or strike a biased juror, the court agrees with Judge Zoss that counsel

did not perform unprofessionally, but instead made a reasoned, strategic decision in difficult circumstances. Moreover, Walters cannot show that "actual bias" of the juror prejudiced his trial or that there is any reasonable probability that the result in his trial would have been different had the juror in question been stricken from the jury.

The analysis of grounds 6, 7(a), and 7(b) was complicated by the fact that there was a disparity between the claims as pleaded and argued by counsel—due process violations from insufficiency of the trial information to give notice of the burglary and felony murder charges—and Judge Zoss's treatment of the claims as "ineffective assistance of counsel" claims. The court finds that no "due process" claim concerning sufficiency of the trial information was preserved for review in these proceedings, but a claim of "ineffective assistance of counsel" was preserved as to trial counsel's alleged failure to challenge the sufficiency of the trial information. The court concludes that Judge Zoss properly considered the sufficiency of notice in the trial information, as that issue was pertinent to the prongs of the "ineffective assistance" analysis to demonstrate unprofessional performance and prejudice. However, the court believes that it must consider the sufficiency of evidence that Walters intended to kidnap Cheryl Beck when he entered the Beck residence, as an element of the burglary charge, only in the context of the significance of that issue to the "ineffective assistance" claims actually asserted, where no "sufficiency of the evidence" claim was properly before the court. Upon *de novo* review of the claims and objections in their proper context, the court concludes that the record demonstrates that Walters's trial counsel had "actual notice" that the kidnapping charge was the predicate or underlying felony to the burglary offense and trial counsel's conduct of Wal-

ters's defense demonstrates that he had and acted upon such notice. Thus, in the absence of any due process violation as to sufficiency of notice of the offenses charged, trial counsel did not perform unprofessionally in failing to challenge the sufficiency of the trial information. The court concludes that the significance of a supposed lack of evidence of intent to commit a kidnapping at the time Walters entered the Beck residence is mooted, in the context of the claims actually before the court, in light of a determination that there was no due process violation arising from insufficient notice of the crimes charged, and in the absence of any independent claim of insufficiency of the evidence of kidnapping properly before the court at this time. However, the court also concludes that the evidence of "intent to kidnap" was sufficient that a rational juror could have found this essential element of the burglary crime beyond a reasonable doubt. Thus, the court agrees with Judge Zoss that relief should be denied on grounds 6, 7(a), and 7(b), albeit for somewhat different reasons.

Notwithstanding the length of this opinion, which was necessitated more by the need to put the numerous claims in their proper context than by any complexity or closeness of the legal issues, the court concludes that Walters has failed to make a substantial showing of the denial of a constitutional right as to any of his claims in these proceedings; consequently, a certificate of appealability will be denied. *See* 28 U.S.C. § 2253(c); *see also Garrett v. United States,* 211 F.3d 1075, 1076–77 (8th Cir.), *cert. denied,* 531 U.S. 908, 121 S.Ct. 254, 148 L.Ed.2d 184 (2000); *Mills v. Norris,* 187 F.3d 881, 882 n. 1 (8th Cir.1999); *Carter v. Hopkins,* 151 F.3d 872, 873–74 (8th Cir.), *cert. denied,* 525 U.S. 1007, 119 S.Ct. 524, 142 L.Ed.2d 435 (1998); *Ramsey*

*v. Bowersox,* 149 F.3d 749 (8th Cir.1998), *cert. denied,* 525 U.S. 1166, 119 S.Ct. 1083, 143 L.Ed.2d 85 (1999); *Cox v. Norris,* 133 F.3d 565, 569 (8th Cir.1997), *cert. denied,* 525 U.S. 834, 119 S.Ct. 89, 142 L.Ed.2d 70 (1998).

THEREFORE,

1. The petitioner's objections, filed *pro se* and through counsel, are overruled except as otherwise expressly indicated herein.

2. Pursuant to 28 U.S.C. § 636(b)(1), the findings and recommendations in Judge Zoss's February 7, 2001, Report and Recommendation are **accepted or modified** as explained more fully herein, and Judge Zoss's recommendation that relief be denied on all grounds asserted in petitioner's "Recasted Petition" is **accepted**. Specifically,

a. Grounds for relief 4, 5, and 8 in the petitioner's "Recasted Petition" are **denied as abandoned**.

b. Grounds for relief 1, 2, 3, 6, 7(a), and 7(b) are **denied on the merits**.

3. A certificate of appealability pursuant to 28 U.S.C. § 2253(c) is **denied** as to all grounds for relief asserted in petitioner's "Recasted Petition."

**IT IS SO ORDERED.**